**UNION CARBIDE CORPORATION,**
**Plaintiff-Appellee,**

v.

**UGI CORPORATION, AmeriGas, Inc.**
**and James A. Sutton,**
**Defendants-Appellants.**

No. 83–1383.

United States Court of Appeals,
Fifth Circuit.

May 11, 1984.

Strasburger & Price, Ernest R. Higginbotham, Wilson W. Herndon, Dallas, Tex., Walter F.X. Healy, Gen. Counsel, Ugi Corp., Valley Forge, Pa., for defendants-appellants.

Rain, Harrell, Emery, Young & Doke, Marshall M. Searcy, Michael V. Powell, Robb L. Voyles, Dallas, Tex., Harvey Belkin, Law Dept., Union Carbide Co., Danbury, Conn., for plaintiff-appellee.

Before REAVLEY, TATE and GARWOOD, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants UGI Corporation, AmeriGas, Inc., and James A. Sutton appeal a preliminary injunction under 28 U.S.C. § 1292(a)(1) (1976). The district court enjoined Sutton, who formerly worked for Union Carbide (Carbide), from disclosing, revealing, or utilizing Carbide's trade secrets or confidential information in any situation where AmeriGas would be competing against Carbide in the industrial gas industry. Appellants raise two issues: (1) whether the district court properly asserted personal jurisdiction over Sutton; and (2) whether the district court abused its discretion in issuing the preliminary injunction. We affirm.

## I. Facts

Union Carbide through its Linde Division, and AmeriGas, a wholly-owned subsidiary of UGI, compete directly in the production and supply of industrial gases. The Linde Division of Carbide is comprised of four departments or business groups, one of which is gas products. AmeriGas is composed of three groups or divisions, one of which is the production and sale of industrial gases. These gases, such as oxygen, nitrogen, and argon, are produced in air-separation plants and sold to various industries.

This dispute centers around the attempts of both Carbide and AmeriGas to supply oxygen to Nucor Steel's "mini mill" steel plant, located in Jewett, Texas. Carbide alleges that AmeriGas tortiously induced Nucor to breach its oxygen supply contract with Carbide and that AmeriGas was assisted by Sutton's disclosure of trade secrets or confidential information that he acquired while working for Carbide. This disclosure, Carbide contends, constitutes misappropriation of trade secrets and a breach of Sutton's fiduciary duty to a former employer. Carbide seeks damages and a permanent injunction that would continue the restraints now imposed on Sutton and AmeriGas by the preliminary injunction.[1]

Sutton, a Pennsylvania resident, began his employment at Carbide's Linde Division in late 1957. As a trusted and highly-valued employee, he rose through the ranks, moving from engineering positions to management positions. By 1978, Sutton was named vice president, general manager of gas products, a role he maintained until May 1982, when he left Carbide to become president of AmeriGas.

In January 1980, Nucor and Carbide entered into a five-year contract under which Carbide would supply Nucor with oxygen at a price of $.28 per hundred cubic feet (ccf). Carbide planned to produce the oxygen at its facility at Garland, Texas, and to deliver the liquid gas by truck. The contract was to expire in January 1985. Early in 1981 Carbide began a substantial expansion of the Garland production facility, partially to accommodate the Nucor business. Later in 1981 Nucor informed Carbide that someone (AmeriGas) had approached it with an offer to supply oxygen at a lower price. AmeriGas and Nucor executed an oxygen supply contract on September 23, 1981. AmeriGas planned to build an on-site air separation plant and to supply the Nucor steel mill with gaseous oxygen at $.24/ccf, beginning in January 1983. After Carbide learned of the AmeriGas-Nucor contract, Carbide officials, including Sutton, met in October 1981 to discuss the Nucor situation. Carbide officials dis-

---

1. The district court recognized that under Texas choice-of-law principles, Pennsylvania would govern Carbide's tort claims. *See Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979).

cussed their business opportunities at Nucor's Jewett mill, in light of AmeriGas' $.24 offer, and calculated Carbide's estimated "disinterest" price, or the point at which the selling price would equal the Garland facility's production and distribution costs. Carbide's disinterest price was $.20/ccf. To preserve the opportunity to supply Nucor's future needs at other locations, Carbide agreed to meet the $.24 price and to shorten the supply contract by one year. The parties amended the contract accordingly by early November 1981.

Soon after Sutton joined AmeriGas he participated in two meetings in which the "Nucor situation" was discussed. Under the amended Carbide-Nucor contract Nucor would be obligated to purchase oxygen from Carbide until January 1984. As its air separation plant at Jewett was under construction, AmeriGas became concerned that Nucor would not begin taking oxygen in January 1983, as provided in the Ameri-Gas-Nucor supply contract. Thus, Ameri-Gas attempted to resolve the problem. At a July 1982 meeting, AmeriGas officials agreed to reduce to $.20/ccf the price of supplying oxygen to Nucor. Sutton attended the meeting and ultimately approved the lower price.

The general manager of Nucor's Jewett mill later notified Carbide, indicating that Nucor had received a lower price for oxygen and that it could terminate the Carbide supply contract. Nucor repudiated its contract with Carbide and began taking oxygen from AmeriGas in January 1983.

The district court found that Sutton's participation in formulating an offering price that equalled Carbide's disinterest price for selling oxygen from the Garland plant provided a sufficient basis for exposing Sutton to individual liability and for asserting personal jurisdiction over him. The court found that the requirements of Texas' long arm statute, Tex.Rev.Civ.Stat. Ann. art. 2031b (Vernon 1964),[2] and due process had been satisfied. Moreover, the court found that the prerequisites for issuing a preliminary injunction had been met. Thus, the court restrained Sutton from disclosing or revealing Carbide's trade secrets or confidential information in 14 different areas[3] and enjoined UGI and AmeriGas

---

**2.** Article 2031b provides in part:

Sec. 2. When any foreign corporation ... or non-resident natural person, though not required by any Statute of this State to designate or maintain an agent, shall engage in business in this State, in any action in which such corporation ... or non-resident natural person is a party or is to be made a party arising out of such business, service may be made by serving a copy of the process with the person who, at the time of the service, is in charge of any business in which the defendant or defendants are engaged in this State, provided a copy of such process, together with notice of such service upon such person in charge of such business shall forthwith be sent to the defendant or to the defendants [sic] principal place of business by registered mail, return receipt requested.

. . . .

Sec. 4. For the purpose of this Act, and without including other acts that may constitute doing business, any foreign corporation, ... or non-resident natural person shall be deemed doing business in this State by entering into contract by mail or otherwise with a resident of Texas to be performed in whole or in part by either party in this State, or the committing of any tort in whole or in part in this State.

Tex.Rev.Civ.Stat.Ann. art. 2031b (Vernon 1964).

**3.** (i) Strategic, long range and annual business plans of Union Carbide;
(ii) Union Carbide's cost and profit data, including bidding procedures, O & R reports and business and capital budgets;
(iii) Information, including customer lists and pricing information, with respect to specific Union Carbide customers;
(iv) Information with respect to future price changes by Union Carbide;
(v) Information with respect to near term planning and plant siting;
(vi) Information with respect to distributor acquisition plans and FTC Consent Order Strategies of Union Carbide;
(vii) Information with respect to specific Union Carbide personnel and personnel compensation;
(viii) Information relating to Union Carbide's capital availability and strategic directions;
(ix) Attorney work-product;
(x) Marketing strategies with respect to Nucor Steel Corporation;
(xi) Competitive strategies with respect to Amerigas;
(xii) Results and conclusions of Union Carbide's research and development and field testing;
(xiii) Information relating to the technical operation or design of any existing Union Car-

from allowing Sutton to participate in situations where Carbide would be a competitor in bidding for industrial gas business.

## II. Personal Jurisdiction

### A. Long Arm Statute

■ Appellants contend that the district court lacked personal jurisdiction over Sutton. They claim that Sutton committed no tort with injurious consequences in Texas; therefore, article 2031b has not been satisfied. Sitting in diversity, we can allow federal jurisdiction over a nonresident defendant only to the extent permitted by Texas' long arm statute. *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 331 (5th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983).

Article 2031b expressly authorizes service of process upon nonresident defendants who have engaged in business in Texas if the action "aris[es] out of such business." For purposes of the long arm statute, "the committing of any tort in whole or in part" in Texas is equivalent to "doing business." The Texas Supreme Court has construed the statute more broadly, obviating the requirement that "the cause of action ... arise from, or be connected with" an act done or transaction consummated by the nonresident defendant in the forum state when his "numerous contacts [are] of such a nature ... as to satisfy the demands of the ultimate test of due process." *Hall v. Helicopteros Nacionales de Colombia, S.A.*, 638 S.W.2d 870, 872 (Tex. 1982), *rev'd on other grounds*, —— U.S. ——, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). We need not decide whether Sutton's contacts with Texas that are unrelat-

ed to this cause would allow article 2031b to reach Sutton under Texas law, however, since the district court properly grounded jurisdiction on those activities implicated in this suit—the out-of-state acts giving rise to Carbide's alleged injury in Texas.[4] *See Bennett Industries, Inc. v. Laher*, 557 F.Supp. 965, 966 (N.D.Tex.1983).

■ Jurisdiction over Sutton is not based on the uncontested jurisdiction over UGI and AmeriGas. Rather, Sutton's personal participation in the actions causally related to Carbide's alleged injury provides a distinct basis for the assertion of personal jurisdiction over Sutton. *See L.C.L. Theatres v. Columbia Pictures Industries, Inc.*, 619 F.2d 455, 457 (5th Cir.1980); *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir.1980). Sutton's admitted attendance at the July AmeriGas meeting wherein the $.20/ccf price was reached and his approval of the price causally relate to Carbide's damages flowing from loss of the Nucor contract under Carbide's claim of tortious interference.

Carbide carried its burden of establishing a prima facie case that appellants committed a tort partially in Texas. *See Jetco Electronic Industries, Inc. v. Gardiner*, 473 F.2d 1228, 1232 (5th Cir.1973). Carbide alleged that appellants intentionally arrived at a price equal to Carbide's disinterest price and tortiously induced Nucor to breach its supply contract with Carbide. Carbide sufficiently alleged all the elements of tortious interference with contract. *See Cook Industries, Inc. v. Community Grain, Inc.*, 614 F.2d 978, 980 (5th Cir.), *cert. denied*, 449 U.S. 952, 101 S.Ct.

---

bide air separation plant, or any prospective Union Carbide air separation plant; and
(xiv) Information relating to the construction, marketing, sales, and technical operation, or design of on-site delivery systems and enhanced oil recovery systems and related equipment.

**4.** Appellants argue that the district court improperly relied on a prima facie showing of personal jurisdiction, and cite as authority *Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56 (2d Cir.1981). In *Visual Sciences,* although essential facts relevant to juris-

diction were sharply disputed, the district court terminated the jurisdiction hearing before defendants cross examined plaintiff's witnesses and before defendants put on evidence. The Second Circuit reversed because the district court's factual findings were insufficient to permit an adequate appellate review.

*Visual Sciences* has no application here. The district court, prior to issuing the preliminary injunction, held an adequate hearing and determined that it had in personam jurisdiction over Sutton.

356, 66 L.Ed.2d 216 (1980) (elements required under Texas law).

Appellants argue that any tortious interference occurred before Sutton left Carbide, when Nucor and AmeriGas signed their supply agreement in September 1981. We disagree. Carbide set forth two instances of tortious interference. Sutton was allegedly involved in interfering with the amended Carbide-Nucor contract, which provided a sale price of $.24/ccf and a termination date of January 1984. Any damage that Carbide suffered from the breach of that amended contract occurred after Sutton joined AmeriGas.

Appellants assert that Sutton's role in the Nucor incident was privileged. They cite *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545 (5th Cir.1981), for the proposition that Sutton, as an agent acting on behalf of his corporation, and not in furtherance of personal motives, committed no tort. The principle that appellants hold forth has no application here. *B., Inc.* and other similar cases stand for the proposition that an agent, acting in good faith for nonpersonal reasons, is privileged to induce his principal to breach a contract with a third party. In this case, by contrast, Sutton (agent) is alleged to have acted with AmeriGas (his principal) to induce Nucor (third party) to breach *its* contract with Carbide, an entity unrelated to AmeriGas, for the benefit of AmeriGas.

Appellants argue that no nexus exists between Carbide's claim for injunctive relief and Sutton's conduct under the tortious interference claim. A sufficient nexus has been established. The Texas Supreme Court requires only that the cause of action be connected with the act having tortious consequences in Texas. *See Siskind v. Villa Foundation for Education, Inc.*, 642 S.W.2d 434, 436–37 (Tex.1982); *Hall*, 638 S.W.2d at 872. Sutton's claimed disclosure of trade secrets is inextricably linked to formulation of the lower offering price to Nucor. The lower price is an essential ingredient to the tortious interference claim.

**B. Due Process**

Appellants claim that the assertion of personal jurisdiction over Sutton does not comport with due process. We disagree. Considering the relationship among "the defendant[s], the forum, and the litigation," *Keeton v. Hustler Magazine, Inc.*, — U.S. —, —, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)), exercising jurisdiction over Sutton is within the limits of the due process clause. Sutton's contacts with Texas, although not systematic or pervasive, "are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Sutton was a primary participant in the AmeriGas meeting wherein problems relating to Nucor's Jewett, Texas mill were discussed. A plan was formulated, approved by Sutton, to address and remedy the Nucor situation. These activities were purposeful, directed at Texas, and sufficiently related to this cause of action. Moreover, Carbide has allegedly been damaged in Texas. Texas has a "significant interest in redressing injuries that actually occur within the [s]tate." *Keeton*, — U.S. at —, 104 S.Ct. at 1478. The district court properly found that it was fair and reasonable to exercise personal jurisdiction over Sutton. *See Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1266–69 (5th Cir.1978).

**III. Issuance of the Preliminary Injunction**

At the outset, we note the narrowness of our inquiry here. The grant of a preliminary injunction "lies within the discretion of the district court, whose decision will be overturned only for abuse." *Hardin v. Houston Chronicle Publishing Co.*, 572 F.2d 1106 (5th Cir.1978) (per curiam). The district court applied the proper test, finding that the following prerequisites were satisfied before issuing the injunction:

(1) a substantial likelihood that the movant will prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if it is issued, would not be adverse to the public interest.

*FMC Corp. v. Varco International, Inc.,* 677 F.2d 500, 502 (5th Cir.1982) (quoting *Compact Van Equipment Co. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir. 1978)).

The industrial gas industry is characterized by high fixed costs, product fungibility, and capital intensity. In this highly competitive industry, production and distribution efficiency is at a premium. To gain a competitive edge, producers devote time and resources to develop more efficient technologies, new product applications, and marketing strategies. Pennsylvania law recognizes as a trade secret "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts § 757 comment b (1939). *See, e.g., Henry Hope X-Ray Products, Inc. v. Marron Carrel, Inc.,* 674 F.2d 1336, 1340 (9th Cir. 1982) (applying Pennsylvania law); *Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114 (1982). The district court found that Carbide's technical and marketing information and strategies were protectable trade secrets under Pennsylvania law. *See Air Products,* 442 A.2d at 1120 (citing *Macbeth-Evans Glass Co. v. Schnelbach,* 239 Pa. 76, 87, 86 A. 688, 691 (1913)). The record amply shows that the strategies and information were of substantial competitive value to Carbide, were treated as confidential, and were revealed to Sutton while he was employed in positions of high responsibility at Carbide.[5]

The district court primarily based its decision that Carbide showed a substantial likelihood of success on the merits on the Nucor incident. Carbide presented strong circumstantial evidence that Sutton revealed to AmeriGas confidential information relating to Carbide's "bottom line" price of providing oxygen to Nucor's Jewett mill. While at Carbide, Sutton had been informed of this disinterest price and was aware of AmeriGas' attempts to compete with Carbide for Nucor's business. Despite this knowledge, after going over to AmeriGas, Sutton participated in meetings and plans directed at the Nucor situation. The district court found a substantial likelihood of disclosure because AmeriGas took no precautions to insulate Sutton from the strategy meetings with obvious potential for conflict. Although appellants claim that Sutton stood mute during the pricing decision, which they claim was determined by others, the district court found that he disclosed Carbide's disinterest price, either directly or by subtle influence. Notes from an earlier AmeriGas meeting wherein the Nucor situation was discussed reveal an exact quotation of the energy efficiency of Carbide's Garland plant and an accurate description of its working capacity at the time. Sutton, who was present at the meeting, had been exposed to this information while at Carbide. The record shows that "unit power efficiency" is essential to calculating disinterest price.

The Nucor incident also provided the basis for the finding that Carbide would likely suffer irreparable harm in the absence of injunctive relief. Carbide's strong showing that Sutton disclosed its disinterest price, and the failure of appellants to exclude Sutton from a situation where disclosure of confidential information would be difficult to avoid, persuaded the district court of the existence of a substantial likelihood of disclosure. "It is not the number

---

**5.** Soon after he began to work for Carbide, Sutton signed an agreement not to disclose secret or confidential information during or after his employment. Regardless of the enforceability of the contract, the district court determined that Sutton was under an independent duty, arising from his fiduciary relationship with Carbide, not to disclose confidential information.

of trade secrets taken that determines whether the threat of irreparable harm exists. The fact that a single trade secret may be disclosed is enough." *FMC Corp.*, 677 F.2d at 503.

Although the areas in which UGI and Carbide compete directly comprise a relatively small portion of their total business activity, disclosure of strategic information would cause Carbide irreparable harm in the absence of injunctive relief prior to the completion of litigation on the merits. In balancing the harm to the parties, the district court found that appellants would suffer relatively little hardship. Sutton testified that he usually did not participate in the bidding process. Moreover, the court found that the injunction would serve the public interest by assuring that competition is "untainted by unfair advantage."

We have carefully considered appellants' arguments and examined the record, but find no error. We reject appellants' argument that the court's order is overly broad and impermissibly vague. Carbide sufficiently satisfied the prerequisites for the issuance of a preliminary injunction and the district court did not abuse its discretion by granting injunctive relief.

AFFIRMED.