**Sol W. LAYKIN, Relator,**

v.

**John R. McFALL, Judge, 237th District Court, Lubbock County, Respondent.**

**No. 07–91–0276–CV.**

Court of Appeals of Texas, Amarillo.

April 28, 1992.

McWhorter, Cobb & Johnson, Brian P. Quinn and Gary R. Terrell, Lubbock, for relator.

Law Offices of Jack McClendon, Jack McClendon and Greg Teeter, Lubbock, for respondent.

Before DODSON, BOYD and POFF, JJ.

BOYD, Justice.

Relator Sol W. Laykin brings this petition seeking writ of mandamus directed to the Honorable John R. McFall, respondent. This proceeding arises from a suit against relator by Jane Livermore seeking recovery for conversion, fraud and deceptive trade practices. Relator, a California resident, filed a special appearance, contesting the Texas court's jurisdiction over him. Respondent, the trial judge, overruled relator's special appearance, finding the court did have jurisdiction over him.

■ Parenthetically, while neither respondent nor the real party at interest, Livermore, contests the right of relator to test respondent's action by this mandamus proceeding, a proper disposition of this proceeding requires us to determine whether the use of that vehicle is proper in this case. We note there is relevant precedent holding that a writ of mandamus may be sought when a special appearance is overruled. *United Mexican States v. Ashley,* 556 S.W.2d 784, 785 (Tex.1977); *Hutchings v. Biery,* 723 S.W.2d 347, 350 (Tex.App.— San Antonio 1987, no writ).[1]

---

**1.** We note that in *United Mexican States* the special appearance was filed on the basis of sovereign immunity. Sovereign immunity concerns both subject matter jurisdiction and personal jurisdiction. 28 U.S.C.A. § 1330(a), (b) (Supp.1990); *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 435 n. 3, 109 S.Ct. 683, 688 n. 3, 102 L.Ed.2d 818, 828 n. 3 (1989); *Verlinden B.V. v. Central Bank,* 461 U.S. 480, 485 n. 5, 489 n. 14, 103 S.Ct. 1962, 1967 n. 5, 1969 n. 14, 76 L.Ed.2d 81, 86–87 n. 5, 89 n. 14 (1983).

In *United Mexican States,* Mexico sought mandamus and the Texas Supreme Court conditionally granted mandamus because Mexico's "motions for *special appearance*" were overruled. *United Mexican States,* 556 S.W.2d 784 (emphasis added). A special appearance may raise the issue of lack of personal jurisdiction but not the issue of lack of subject matter jurisdiction. Tex. R.Civ.P. 120a1; *Oliver v. Boutwell,* 601 S.W.2d 393, 395 (Tex.Civ.App.—Dallas 1980, no writ); *Crockett v. Crockett,* 589 S.W.2d 759, 762–63

However, the viability of that precedent in the instant case requires us to examine closely the recent seminal decision of our Supreme Court in *Walker v. Packer*, 827 S.W.2d 833 (1992). In that case, and as relevant here, the Court held that the propriety of a trial court refusal to accede to discovery requests might not be tested by mandamus, but, since the refusal could be tested on appeal, mandamus was not available. In the course of its holding, the Court conducted an extensive review of prior holdings indicating that mandamus was available in such instances. In doing so, it reiterated the long standing rule that mandamus would not lie where there is an adequate remedy by appeal and concluded that "an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ." *Id.* at 474, 827 S.W.2d at 842. In reaching that conclusion, the Court specifically disapproved cases which, it observed, had not adequately considered the above rule, and applied a more lenient standard justifying mandamus review whenever an appeal "would arguably involve more cost or delay than mandamus." *Id.*

However, in its discussion, the Court noted even in discovery cases there were instances where a party might not have an adequate remedy by appeal. One such instance, it commented, would be "where a discovery order compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." *Id.* at 475, 827 S.W.2d at 843.

We believe the erroneous overruling of a special appearance is analogous to the above situation described by the Supreme Court. When a nonresident's special appearance is erroneously overruled, the burden on the nonresident is great; he must go through an entire trial in order to have the action dismissed on appeal. Furthermore, the burden is far out of proportion to any benefit that may obtain to the other party. In fact, there is no benefit to the other party in having to go through the expense and delay of an entire trial when the action will be dismissed on appeal with the result that the trial was an exercise in futility. That being so, the burden is heavy on both parties.

We believe the decisions in *United Mexican States* and *Hutchings* in holding that a writ of mandamus may be issued to correct an erroneous overruling of a special appearance constitute viable precedent in this case. Thus, we hold that relator is entitled to seek mandamus in the instant proceeding.

It is well established that, to be entitled to mandamus, a relator must establish a clear legal right to the issuance of the writ. *King v. Payne*, 156 Tex. 105, 292 S.W.2d 331, 336 (1956). In this cause, relator requests that the trial judge be directed to set aside his order overruling the special appearance and enter an order granting his special appearance dismissing the underlying suit. Alternatively, relator requests that this court reverse the trial court's order and dismiss the suit for lack of personal jurisdiction.

The suit against relator arose from a transaction in which Livermore, a Texas resident, telephonically contacted relator, a California resident, and requested that he sell a ring for her. They agreed that the ring would be sent to relator and the proceeds, less a commission for relator, would be sent to Livermore in Texas. If relator was unable to sell the ring, it would be returned to Texas.

Livermore sent the ring to relator in California. However, before relator could find a buyer for the ring, Livermore found one in Texas. Livermore requested that relator return the ring, but he refused to do so and attempted to negotiate a purchase of the ring for himself. In doing so, relator sent two letters to Texas (one to Livermore and one to her attorney) and, Livermore alleged, relator made two phone

(Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.). Thus, *United Mexican States* concerned personal jurisdiction only.

calls to her in Texas. During this time, Livermore repeatedly demanded either return of the ring or payment of the amount she requested.

Prior to the suit, relator had never owned any real or personal property in Texas, never solicited any business in Texas, nor ever visited Texas. While relator has had up to twelve customers from Texas, all of the sales to them occurred in states other than Texas.

In *U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978), the Court held that the Texas long arm statute is limited only by the constitutional limitations of due process. *See also Hoppenfeld v. Crook,* 498 S.W.2d 52, 56 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.). The *U–Anchor* Court went on to say that such a construction is desirable in that it allows courts to focus on the constitutional limitations of due process rather than engaging in technical and abstruse attempts to define the wording of the long arm statute. *See U–Anchor,* 553 S.W.2d at 762; *Hoppenfeld,* 498 S.W.2d at 56. Indeed, in *Helicopteros Nacionales v. Hall,* 466 U.S. 408, 413, 104 S.Ct. 1868, 1871, 80 L.Ed.2d 404, 410 (1984), which involved a question of the right of Texas to exercise in personam jurisdiction over a nonresident, the Supreme Court noted and accepted the holding of the *U–Anchor* Court that the Texas long arm statute reaches as far as due process permits, with the comment, "Thus, the only question remaining for the court to decide was whether it was consistent with the Due Process Clause for Texas courts to assert in personam jurisdiction over Helicol."

For a Texas court to exercise jurisdiction over a nonresident in a manner consistent with constitutional guarantees of due process, three requirements must be met:

(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in Texas.

(2) The cause of action must arise from, or be connected with, such act or transaction. Even if the cause of action does not arise from a specific contact, jurisdiction may be exercised if the defendant's contacts with Texas are continuing and systematic.

(3) The assumption of jurisdiction by the court must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in Texas, the relative convenience of the parties, the benefits and protection of the laws of Texas afforded the respective parties, and the basic equities of the situation. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356–58 (Tex.1990).

In the *Schlobohm* case, the Court cautioned that these elements are not to be mechanically applied, but are rather to provide a checklist to help ensure that all aspects of the necessary due process jurisdictional analysis are considered. *Id.* at 358.

The first part of the Texas formula regards the issue of whether the defendant's activities, regardless of their volume, justify the conclusion that he purposefully directed his activities into Texas such that he should have reasonably anticipated being called into a Texas court. *Id.* at 359.

The mere fact that relator had customers who came to him from Texas and that Livermore's contact with him originated from Texas is not sufficient to justify the required conclusion. Since the determination of the issue requires a focus upon the activities of the defendant, the activities of others cannot support a determination of the requisite conclusion that defendant purposefully directed his activities into Texas in such a manner that he should have reasonably anticipated being called into a Texas court. *See Schlobohm v. Schapiro,* 784 S.W.2d 355; *U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760.

Relator's agreement to either send the sale proceeds of the ring or to send the ring back to Texas, even coupled with the two letters and two phone calls to Texas, do not amount to the required purposeful invocation of the benefits and protections of Texas law. *See U–Anchor Advertising,*

*Inc. v. Burt*, 553 S.W.2d 760. Indeed, relator did nothing to indicate or support an inference of any purpose on his part to exercise the privilege of conducting activities in Texas.

In *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the United States Supreme Court had occasion to explore in some depth the requisites to maintain jurisdiction over a non-resident. In that case, the Court found that the non-resident petitioners' conduct gave California jurisdiction over them. The respondent claimed that she had been libeled in an article written and edited by petitioners in Florida.

The Court noted that respondent, the subject of the allegedly libelous magazine article, lived and worked in California and the article concerned respondent's activities in California. *Id.* at 785, 788, 104 S.Ct. at 1484, 1486. The Court also noted: (1) the circulation of the magazine in California was about 600,000, almost twice the level of the next highest state, (2) petitioner South, the author of the first draft of the article, had gathered the information contained in the article by phone calls to sources in California,[2] (3) petitioner South, shortly before publication, called respondent's home and read to her husband a draft of the article so as to elicit his comments on it, (4) petitioner Calder, president and editor of the magazine, " 'oversee[s] just about every function of the [maga-

zine],' " *Id.* at 786, 104 S.Ct. at 1485, (5) petitioner Calder reviewed and approved the initial evaluation of the subject of the article and edited it in its final form, and (6) petitioner Calder declined to print a retraction requested by respondent. *Id.*

The Court concluded that the petitioners' "actions were expressly *aimed* at California," *Id.* at 789, 104 S.Ct. at 1487 (emphasis added), and "intentionally *directed*" at California,[3] *Id.* at 790, 104 S.Ct. at 1487 (emphasis added).

The dissent would rest jurisdiction upon the torts of fraud and conversion. However, unlike the petitioners' actions and the surrounding circumstances enumerated in *Calder* and which were determinative in that case, relator's actions do not rise to the necessary level of an act or acts purposefully directed at or aimed at Texas as a forum. While in the *Calder* case, in the words of the Court, "California [was] the focal point of both the story and of the harm suffered," in this case Texas is not the focal point of relator's action. *Id.* at 789, 104 S.Ct. at 1486. En route to its decision, the *Calder* Court emphasized, "the plaintiff [residing in California] is the focus of the activities of the defendants." *Id.* at 788, 104 S.Ct. at 1486. In this case, Livermore was not the focus of relator's activities.

While Livermore was allegedly harmed by relator's actions in response to Liver-

---

**2.** In footnote six of that opinion, the Court stated that it did not rely on the investigative activities as forming an independent basis for jurisdiction. *Id.* at 787, 104 S.Ct. at 1485. However, while not forming an independent basis for jurisdiction, the phone calls apparently impacted on the Court's decision that petitioners' "activities were expressly *aimed* at California [emphasis added]," which formed a portion of the "effects" basis for jurisdiction.

That the phone calls impacted on the Court's holding appears from the inclusion of that fact in the opinion. This becomes further apparent by footnote four in which the Court referred to an alleged visit to California by petitioner South—a fact (unlike the phone calls) stated by the Court as not relied upon for its holding and not described by the Court in the body of the opinion. *Id.* at 786, 104 S.Ct. at 1485.

The Court also pointed out, among other facts, that "[t]he article was drawn from California sources," in determining that California was

the focal point of the story and of the harm suffered and, thus, jurisdiction was proper. *Id.* at 788–89, 104 S.Ct. at 1486–87.

**3.** Although the Court's actual language was "intentionally directed at a California resident," read in the context of the other statements made by the Court, it is apparent the Court found jurisdiction proper because the petitioners intentionally directed their activities at the forum—California. The Court's statement should not be interpreted beyond the facts of the case. For example, we do not find the language as supporting jurisdiction when the forum resident is injured outside the forum and the tortfeasor is unaware of the injured party's residence, *i.e.,* a Texan who intentionally torts a vacationing California resident in Texas, unaware of the person's residence. In such a case, the tortfeasor could not reasonably anticipate being haled into a California court.

more's initiated contact with him, those actions cannot be said to be directed at Texas or focused upon Livermore in the same manner the *Calder* petitioners' activities were directed at California and focused upon that plaintiff. In *Calder*, the California activities of a California resident, being the subject of the magazine article, *Id.* at 788, were obviously the focus, direction, and aim of the respondent's actions.

■ We find the dissent's proposition that under *Calder*, the necessary minimum contacts are always established when an intentional tortfeasor knowingly causes an injury in Texas to be too broad an interpretation of the *Calder* case.

The United States Supreme Court and Texas Supreme Court have rejected the notion that personal jurisdiction might be determined by mechanical tests. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528, 545 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95, 103 (1945); *see also Schlobohm v. Schapiro*, 784 S.W.2d at 358. "Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *International Shoe Co. v. Washington*, 326 U.S. at 319, 66 S.Ct. at 160; *accord Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 806, 105 S.Ct. 2965, 2971, 86 L.Ed.2d 628, 638 (1985); *see also Schlobohm v. Schapiro*, 784 S.W.2d at 358–59.

To hold that the requisite minimum contacts are automatically established when an intentional tortfeasor knowingly causes injury in the forum state would practically reduce due process to a mechanical test which fails to examine the quality and nature of the non-resident's actions.[4]

We hold that the quality and nature of relator's actions are such that he did not purposefully direct his activities into Texas in such a manner that he should have reasonably anticipated being sued in a Texas court. That being so, this state lacks jurisdiction over the relator and he had a clear legal right to have his special appearance sustained and the suit dismissed.

We must, therefore, conditionally grant relator's petition for writ of mandamus, direct respondent to vacate his order overruling the special appearance and enter judgment granting relator's special appearance and dismissing the suit for lack of jurisdiction. Since we are confident that respondent will comply with our direction, the writ will issue only if he fails to do so.

DODSON, Justice, concurring.

I concur with the results reached by the majority opinion authored by Justice Boyd. In my view, the circumstances presented are insufficient to bring this case within the purview of the "effect doctrine" enunciated in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In essence, I am not persuaded that where there is merely a claim that an intentional tort committed in California that injured a Texas resident is sufficient to invoke the "effect doctrine." Thus, I respectfully concur.

POFF, Justice, dissenting.

I find Sol W. Laykin (Sol) is amenable to the jurisdiction of the Texas courts under Tex.Civ.Prac. & Rem.Code Ann. § 17.042(2) (Vernon 1986), and I further find the exercise of this jurisdiction to be consistent with due process under the 14th Amendment to the United States Constitution. Therefore, I must respectfully dissent.

Under the general Texas long-arm statute, section 17.042, Jane Livermore (Jane)

---

4. Determining that an activity is an intentional tort might be construed as determining the activity's nature. However, in *Calder*, the Court, in examining the petitioners' conduct, refused to determine whether the petitioners' conduct constituted a tort. The Court described the petitioners' conduct as "intentional, and *allegedly* tortious," *Calder*, 465 U.S. at 789, 104 S.Ct. at 1487 (emphasis added), and further described the conduct as an "*alleged* wrongdoing," *Id.* at 790, 104 S.Ct. at 1487 (emphasis added). Thus, it appears that determining an activity's nature does not encompass determining whether the activity creates a specific legal cause of action. *See also Hoppenfeld v. Crook*, 498 S.W.2d 52.

Regardless, we refuse to hold that all intentional torts are of the same quality.

had the initial burden of making a prima facie case by pleading sufficient allegations to bring Sol within the provisions of the statute. *McKanna v. Edgar,* 388 S.W.2d 927 (Tex.1965). Jane clearly met this burden by alleging that Sol committed the torts of fraud and conversion within the State of Texas. Texas courts are authorized to exercise long-arm jurisdiction over any non-resident who "commits a tort in whole or in part in this state." Tex.Civ. Prac. & Rem.Code Ann. § 17.042(2) (Vernon 1986).

Jane having made the prima facie case, Sol had the burden to prove that he was not amenable to the court's jurisdiction. The trial court was required to make its determination as to whether it would exercise jurisdiction over Sol on the basis of "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may [have been] filed by the parties, the results of discovery processes, and any oral testimony." Tex. R.Civ.P. 120a. In order to determine whether Sol carried this burden, a closer look at the evidence that was properly before the trial court is necessary.

The undisputed evidence reflects that in December 1989, Jane telephoned Sol and solicited his services to sell a ring she inherited from her late mother. The ring had been purchased from Sol in his Arizona jewelry store in 1965. Jane knew of Sol because of past dealings between Sol and her mother. Before December 1989, Sol had no contacts with Texas or Texans other than selling to Texans who would come into his stores in California, Arizona and Illinois.[1]

The ring in question is a platinum ring set with one emerald cut natural canary diamond weighing 3.63 carats, one emerald cut white diamond weighing 3.68 carats, and forty-six baguette diamonds with a total weight of 4.84 carats. In addition to being one of Sol's customers, Jane's mother had become a personal friend of Sol and his wife. At the time of the purchase of the ring, Sol's wife had expressed a desire to own the ring. Sol contends that Jane's mother, being aware of his wife's desire for the ring, had agreed upon her death to have the ring sold to Sol's wife for the original purchase price of $16,363.64. There was no evidence Jane's mother made any such provisions in her will.

During the initial telephone conversation, Sol agreed to sell or "otherwise dispose" of the ring. Jane subsequently mailed the ring to him in California. Before receiving the ring, Sol contacted Jane in Texas by telephone concerning the date on which the ring would be mailed and the value of the ring. On January 3, 1990, Jane responded to Sol's telephone call by a letter which contained information on offers she had previously received for the ring. After receiving the ring, Sol never attempted to sell the ring because he believed he had a right to purchase the ring for his wife.

During Sol's inaction, Jane found another buyer for the ring. Accordingly, she informed Sol of this fact and requested the return of the ring. The request placed Sol between the proverbial rock and a hard place for he had already given the ring to his wife, who he stated "was reluctant to give it up." Needless to say, Jane's numerous attempts to reach Sol by telephone were fruitless. Jane then sent a letter to Sol on February 14, 1990 requesting that the ring be returned. Since Sol did not respond in any manner, Jane sent another letter dated April 23, 1990 demanding the return of the ring by April 30, 1990. Once again, Sol did not respond so Jane was forced to send another letter to Sol on May 17, 1990 demanding that he return the ring or pay the reduced asking price of $52,000 by May 25, 1990.[2]

Jane next had her attorney send a letter to Sol demanding the return of the ring. Sol responded to the attorney's letter on August 13, 1990. In his responsive letter, Sol explained that he would be willing to pay Jane an amount equal to the price for

---

1. Sol operated eight stores located mainly in I. Magnin & Co. stores in three states.

2. The letters dated February 14, April 23 and May 17 were all certified and the record reflects they were received by Sol or his employees.

which he had originally sold the ring to Jane's mother in 1965—$16,363.64—plus six percent interest from the date of the sales slip. Sol admitted giving the ring to his wife who had coveted the ring since its original sale to Jane's mother.

Jane alleged that she originally told Sol to price the ring at $58,000, but Sol claimed not to recall the agreed-upon price. Sol offered to pay Jane $20,000 to $30,000 for the ring but Jane refused. Sol never disputed that the market value of the ring was in excess of $52,000. He continues to believe, however, "that it is not unreasonable for [him] to ask Jane Livermore to honor her mother's wishes" and sell the ring to him at a price well below its value. At this time, Sol retains possession of the ring and Jane has not received any compensation.

On the basis of the evidence presented to the trial court, Sol did not prove to the court's satisfaction that he did not commit the torts of fraud and conversion in whole or in part in Texas. Sol is therefore amenable to the jurisdiction of the Texas courts unless the Texas long-arm statute fails to authorize the exercise of jurisdiction over him; or unless the exercise of such jurisdiction under the Texas statute offends federal and state constitutional guarantees of due process. Stated in the affirmative, Texas courts may exercise jurisdiction over a non-resident if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction does not offend federal and state constitutional guarantees of due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex.1990). I will first examine whether the Texas long-arm statute authorized the trial court to exercise jurisdiction.

The general Texas long-arm statute permits our courts to exercise jurisdiction over any non-resident who "commits a tort in whole or in part in this state." Tex.Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1986). Because Sol was physically in California when he committed the tortious conduct, a question naturally arises as to whether the long-arm statute reaches Sol. For the following reasons, that question should be answered affirmatively.

While physically in California, Sol allegedly made telephonically transmitted false representations that were received by and relied upon by Jane in Texas.[3] Therefore, Sol allegedly committed the tort of fraud partially in Texas because fraud is "a two-element tort which is not actionable until relied upon to the detriment of the person to whom the representations were made." *Hoppenfeld v. Crook*, 498 S.W.2d 52, 56 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.). I find *Hoppenfeld* to be instructional in its analysis of the meaning of the phrase "commit[ting] a tort in whole or in part in [Texas]." As noted in *Hoppenfeld*, the fact that the defendant's misrepresentations took place in New York did not, in light of the plaintiff's reliance in Texas, mean the tort did not take place in Texas. The *Hoppenfeld* court stated that "the statements made in New York by appellant, Hoppenfeld, may well be sufficient to give rise to liability in fraud and when relied upon in Texas, possibly to confer jurisdiction on a Texas court as well." In light of recent federal cases expanding the power of a state to exercise jurisdiction over non-residents, I believe the *Hoppenfeld* court would today find not only that the fraud occurred in Texas but that jurisdiction also attaches in Texas. Taking the *Hoppenfeld* court at its word that "[t]he rule is now well entrenched in the federal courts, and we are in agreement, that the reach of art. 2031b [now 17.042] is limited only by the United States Constitution,"

---

3. In this case, there is some evidence to show that Sol made misrepresentations with knowledge of their falsity. Sol stated that "when Jane Livermore sent the ring to me, I assumed that she was aware of the commitment from her mother." Sol, of course, was referring to the supposed commitment Jane's mother had made to direct that the ring be sold to Sol's wife for its original price upon her (Jane's mother's) death.

Sol's statement constitutes some evidence that he knew Jane was planning to send him the ring that his wife had desired twenty-five years earlier. When combined with the undisputed fact that Sol determined to give the ring to his wife when he realized the ring was the one his wife had wanted, there is certainly some evidence in the record that Sol did not intend to sell Jane's ring at the time he so promised.

*Hoppenfeld v. Crook,* 498 S.W.2d at 56, I am confident that the court would today affirm the denial of the special appearance.

In addition to *Hoppenfeld, Read v. Cary,* 615 S.W.2d 296, 298–99 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.) holds that when an individual makes false representations that are communicated to, and relied upon by a person in Texas, those representations are deemed to have been made in Texas for jurisdictional purposes, regardless of the individual's physical location at the time he made the representations. Both *Hoppenfeld* and *Read* support the finding that Sol committed a tort in whole or in part in Texas.

I, therefore, find that since Jane was in Texas when she relied on Sol's fraudulent representation that he would serve as a broker for her ring, Jane's allegation that Sol committed fraud in Texas is entirely correct. The Texas long-arm statute reaches Sol because regardless of his location at the time he made the representations, they were communicated to and relied upon by Jane in Texas. *Read v. Cary,* 615 S.W.2d at 298–99; *Hoppenfeld v. Crook,* 498 S.W.2d at 56.

Even if Jane had only alleged Sol committed the tort of conversion, section 17.-042(2) of the Texas long-arm statute would reach Sol because a "part" of the tort took place in Texas; *i.e.,* the failure to return the ring to Jane in Texas. While my research has not produced Texas jurisdictional cases based upon conversion, I find the reasoning to be analogous to the fraud cases where the fraud took place outside the state, but the injury took place in Texas.

I find additional support in that the Fifth Circuit has repeatedly held that an intentionally tortious act physically committed outside of Texas is considered to have been committed within the State of Texas if the injury resulting from that act occurs within this state. *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1189–90 (5th Cir.

1984) (Justice Reavley stating that, under the Texas long-arm statute, jurisdiction was properly grounded on the defendant's out-of-state acts giving rise to injury in Texas).

Thus, under the Fifth Circuit's interpretation of our law, the Texas long-arm statute confers jurisdiction over an intentional tortfeasor whose torts result in injury in this state, even if the tort was physically committed outside Texas. In *Hearne v. Dow–Badische Chem. Co.,* 224 F.Supp. 90, 96 (S.D.Tex.1963), the court opined that the "in part" wording of the long-arm statute was "clearly intended to include a situation where the operative wrongful act occurs within another state but the injury occurs in Texas."[4]

Even if I were not to interpret 17.042(2) of our long-arm statute as have the above cited state and federal cases, Sol is still within the reach of Texas courts. Section 17.042 states that a non-resident who commits acts other than the three acts specifically enumerated in that section may be considered to have done business in Texas and rendered himself amenable to the call of the Texas courts. The Texas Supreme Court has not been hesitant to rely on the "other acts" provision of § 17.042 to extend the long-arm's reach over non-resident defendants. *See Schlobohm v. Schapiro,* 784 S.W.2d 355 (Tex.1990). In *Schlobohm,* the court found that because the non-resident defendant's acts "concern[ed] a business enterprise," the long-arm statute authorized the exercise of jurisdiction over him. In our case, Sol's alleged tortious activities most definitely concern a business enterprise—his own. While Texas had a strong interest in exercising jurisdiction over the defendant in *Schlobohm,* the state's interest in bringing Sol before its tribunals is even greater. Sol's acts in regard to a business enterprise were alleged to be tortious; not so with the acts of the defendant in *Schlobohm.* We find the Texas long-arm statute also authorizes the

---

**4.** The Fifth Circuit's interpretation of Texas law is, of course, not binding upon the courts of Texas. However, I find the Fifth Circuit's repeated holdings that the Texas long-arm statute authorizes jurisdiction over those who intentionally cause injury within the state by virtue of their tortious actions outside of Texas to be particularly well-reasoned.

exercise of jurisdiction over Sol under its "other acts" provision.

Contrary to what the majority concludes, there are two distinct bases upon which Texas' exercise of jurisdiction over Sol is consistent with the constitutional guarantee of substantive due process. First, as noted, my reading of the evidence convinces me that Sol committed the tort of fraud in Texas. The evidence does not show that Sol made his decision to buy the ring only after receiving it. For over 20 years, Sol had believed he had a right to purchase the ring at below-market value from the Livermore Estate. As noted, Sol's wife had coveted the ring since 1965. Both Sol and his wife believed the ring would someday be hers.

It is clear that Sol knew which rings had been sold to Jane's mother. Furthermore, he was certainly aware of the possibility that the ring being sent could in fact be the ring that Sol alleges was promised to be sold back to him by Jane's mother. It is apparent, therefore, that Sol *was* reckless in stating that he would sell the ring or return it when he obviously had no intentions of doing either if the ring received was the one he was allegedly promised. Therefore, he was aware of the statement's falsity. In fact, Sol even stated that "when Jane Livermore sent the ring to me, I assumed that she was aware of the commitment from her mother." So, it is probable that Sol knew full well which ring was being sent.

Whether or not Sol "promised" the ring to his wife until he received and recognized it is irrelevant. At the time of the initial telephone conversation with Jane, it is obvious that there was a reasonable probability that the ring she was sending would be the one allegedly promised to be sold back to him by Jane's mother.

Having concluded the fraud was committed during the initial telephone conversation, I am further convinced the fraud took place in Texas. Although Sol was in California when he made the misrepresentations, the misrepresentations were telephonically transmitted to Jane in Texas. Jane was in Texas when she heard the misrepresentations and when she relied upon such misrepresentations. I, therefore, conclude the tort was committed in Texas. Under the "commission of a tort" provisions of the long-arm statute, jurisdiction over a non-resident defendant may be exercised when he "is the author of an act or omission within the forum state, and the petition states a cause of action in tort arising from such conduct." *Arterbury v. American Bank & Trust Co.*, 553 S.W.2d 943, 948 (Tex.Civ.App.—Texarkana 1977, no writ); *see also Portland Savings & Loan Ass'n v. Bernstein*, 716 S.W.2d 532, 535 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986); *Quiroz v. McNamara*, 585 S.W.2d 859, 863–64 (Tex.Civ.App.—Tyler 1979, no writ).

In the alternative, even if Sol's commission of the tort is considered to have occurred partially in Texas or wholly in California, the tort was still unquestionably intentional and it was reasonably foreseeable that the commission of the tort would cause injury in Texas. Given such circumstances, Texas' assertion of jurisdiction over Sol for the damages caused by said injury does not violate the Due Process Clause. *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

In 1984, a unanimous United States Supreme Court endowed each of the fifty states with a theretofore unsanctioned authority. By way of its opinion in *Calder*, the Court declared that a forum state may exercise jurisdiction over a non-resident who, while physically outside the forum state, intentionally causes injury to a person in the forum state. The exercise of such jurisdiction was held to violate no constitutional strictures. In *Calder*, the Supreme Court stated that "[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause injury in California." *Id.* at 790, 104 S.Ct. at 1487. The Court held that "jurisdiction over [the Florida residents] in California is proper because of their intentional conduct in Florida calculated to cause injury to [the

plaintiff] in California." *Id.* at 791, 104 S.Ct. at 1488.

In *Calder*, entertainer and actress Shirley Jones brought suit in a California court claiming that she had been libeled in an article published in the National Enquirer. Among the defendants were two Florida residents—John South, an Enquirer reporter who wrote the first draft of the challenged article, and Iain Calder, president and editor of the Enquirer who approved and edited the article. South did most of his research for the article in Florida, relying on telephone calls to California sources to gather information for the article. He may also have made at least one trip to California in connection with the article. Calder worked on the article only in Florida, the corporate home of the Enquirer and its principal place of business. Upon being served with process in Florida, both men filed special appearances in which they asserted that California could not exercise personal jurisdiction over them.

The United States Supreme Court found that the activities of South and Calder were "expressly aimed at California" because both men knew the article would injure Jones and "the brunt of that injury would be felt by [Jones] in the state in which she lives and works and in which the National Enquirer has its largest circulation." *Calder v. Jones*, 465 U.S. at 789–90, 104 S.Ct. at 1487. Having thus found, the Court held that "jurisdiction over [South and Calder] in California [was] proper *because of their intentional conduct in Florida calculated to cause injury to [Jones] in California.*" *Id.* at 791, 104 S.Ct. at 1488 (emphasis added).

Contrary to the majority's conclusion, 830 S.W.2d at 270 n. 2, South's numerous telephone contacts and possible visit to California did not impact on the Court's finding. This is true because Calder, unlike South, made no calls or trips to California and yet he was still found to be amenable to the jurisdiction of California. The Supreme Court explicitly stated that its holding did not depend on the alleged fact that South visited California in connection with the article. *Calder v. Jones*, 465 U.S. at

785 n. 4, 104 S.Ct. at 1485 n. 4. In making that explicit statement, the Court referenced footnote 6 in which it found it unnecessary to consider whether South's visit and numerous phone calls formed an independent basis for the exercise of jurisdiction. *Id.*

The Supreme Court held that California could properly exercise jurisdiction on the basis of the "effects" test employed by the California Court of Appeal. The Court explicitly approved the "effects" test and stated:

A valid basis for jurisdiction existed on the theory that [South and Calder] intended to, and did, cause tortious injury to [Jones] in California. The fact that the actions causing the effects in California were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects.

*Id.* at 787, 104 S.Ct. at 1485.

A non-resident intentional tortfeasor can reasonably expect to be haled into the forum state's courts to defend his actions, *id.* at 789–90, 104 S.Ct. at 1486–87, because the tortfeasor's knowledge that the injury would be felt in the forum state constitutes the performance of a purposeful act in that state. *Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir.1989). Therefore, I cannot agree with the majority that Sol did not purposefully direct his activities into Texas in such a manner as to reasonably anticipate being sued in a Texas court. Sol could have reasonably anticipated that if he defrauded a Texas citizen and caused a valuable diamond ring to be removed from Texas that he would be called into Texas courts when he converted the ring by failing to return it to Texas.

The majority holds that Sol is not amenable to the jurisdiction of the Texas courts because he did not initiate contact with Jane and because he never actively sought Texas customers. *See* 830 S.W.2d at 269. The majority finds Sol to be a man in California, minding his own business, who is rudely forced to defend himself in Texas because of "the activities of others." *See* 830 S.W.2d at 269. To the contrary, we

find Sol is being haled into Texas to account for his misdeeds, not those of Jane Livermore. The fact that Sol did not initially contact Jane and the fact that he never actively sought Texas customers does not immunize him from amenability to process in Texas. As the Supreme Court has made clear, consideration of a defendant's other contacts with the forum state is unnecessary when he has intentionally inflicted injury in the forum state. *Calder v. Jones*, 465 U.S. at 785–87, n. 4 & 6, 104 S.Ct. at 1485 n. 4 & 6.[5] If a defendant commits an intentional tort outside the forum state that he knows will cause injury in the forum state, an independent basis for the exercise of jurisdiction exists. *Id.* at 787, 104 S.Ct. at 1485.

Numerous scholars also endorsed the Supreme Court's acceptance of the "effects" test. *See* W. Frank Newton & Jeremy C. Wicker, *Personal Jurisdiction and the Appearance to Challenge Jurisdiction in Texas*, 38 Baylor L.Rev. 491, 535–36 (1986). According to Dean Newton and Professor Wicker, *Calder* exemplifies what they term the "tort" effects basis of jurisdiction: "A forum state acts within the constraints of due process when it asserts personal jurisdiction over a defendant who intentionally inflicts injury on a resident of the forum state." *Id.*[6] At this point, it should be noted that the tort effects test relates to the effects of intentional torts as opposed to negligent torts. If the tort is not of the intentional variety, jurisdiction will not exist on the basis of the tort alone.

*Calder* has been broadly interpreted by the courts. The Ninth Circuit has depicted *Calder* as allowing "the exercise of jurisdiction over a defendant whose only 'contact' with the foreign state is the 'purposeful direction' of a foreign act having effect in the forum state." *Metropolitan Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1065 (9th Cir.1990) (case involving fraud, conversion, and the intentional infliction of emotional distress). The Fifth Circuit has similarly interpreted *Calder:*

> In *Calder*, the Supreme Court held that when an alleged tort-feasor's intentional actions are expressly aimed at the forum state, and the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum, the tort-feasor must reasonably anticipate being haled into court there to answer for its tortious actions. This holds true even if the tort-feasor's conduct occurs in a state other than the forum state.

*Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772 (5th Cir.1988) (case involving tortious interference with business relations). Additionally, many federal district courts have given *Calder* an expansive interpretation.[7] The great weight of

**5.** When a defendant intentionally inflicts injury that he knows will be felt in the forum state, he has purposefully done an act in Texas. Such an act will always meet the first of the three *Schlobohm* requirements, *see* 830 S.W.2d at 269. Assuming that the defendant is being sued for the infliction of that injury, the second *Schlobohm* requirement will be met in every case. *See id.* When the first two requirements are met, minimum contacts have been established. *See Schlobohm v. Schapiro*, 784 S.W.2d 355, 359 (Tex.1990). Recognizing, however, that jurisdiction is not to be determined by mechanical tests, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528, 545 (1985), I will not go so far as to say that the third *Schlobohm* requirement is met in *all* cases where the defendant intentionally inflicts injury that he knows will be felt in the forum state. There may indeed be some cases where "despite the existence of minimum contacts, there is [a] reason why our assertion of jurisdiction ... would offend traditional notions of fair play and substantial justice." *Id.* But as our Su-

preme Court has recognized, "[o]nly in rare cases ... will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex.1991). The present case is not one of those rare cases.

**6.** The quoted language is perhaps not as precise as it could be. I agree with the comments of the majority in footnote 3. 830 S.W.2d at 270 n. 3. However, the present case does not involve a situation where "the forum resident is injured outside the forum and the tortfeasor is unaware of the injured party's residence." *Id.* Thus, the point made in the majority's third footnote has no bearing on this particular case.

**7.** *See e.g., Davila–Fermin v. Southeast Bank, N.A.*, 738 F.Supp. 45, 49 (D.Puerto Rico 1990); *Coblentz GMC/Freightliner, Inc. v. General Motors Corp.*, 724 F.Supp. 1364, 1369 (M.D.Ala.

authority simply does not support the majority's restrictive view of *Calder.*

Like all states, Texas has a natural interest in effects occurring within its territory, even if the act causing those effects was committed elsewhere. *See* Restatement (Second) of Conflict of Laws, § 37 cmt. a (1969). As Circuit Judge Reavley has stated, "Texas has a significant interest in redressing injuries that actually occur within the State." *Union Carbide Corp. v. UGI Corp.,* 731 F.2d 1186, 1190 (5th Cir. 1984) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790, 798 (1984)). In *Keeton,* the Supreme Court declared:

> A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort.

*Keeton v. Hustler Magazine, Inc.,* 465 U.S. at 776, 104 S.Ct. at 1479 (citations omitted). Our legislature has demonstrated a marked concern in protecting Texas citizens from the type of deceptive trade practices allegedly employed by Sol. *See Siskind v. Villa Found. For Educ., Inc.,* 642 S.W.2d 434, 437 (Tex.1982).

*Calder* gives the State of Texas an opportunity to protect its citizens from unscrupulous non-residents who are only too glad to bilk and swindle unsuspecting Texans from the comfort of their out-of-state offices. I would accept the Supreme Court's beneficent offer to Texas to extend this additional protection to its citizens. The majority's failure to extend the benefits of *Calder* could have a chilling effect on all Texans who initiate agreements with out-of-state entities for consignment of property.

Because the Texas long-arm statute reaches Sol and because the exercise of

jurisdiction over Sol by the Texas courts does not contravene any constitutional strictures, I cannot agree with the majority that Sol has a clear legal right to the issuance of a writ of mandamus. Mandamus should be denied.

---

1989) ("when the origin of a deliberate, nonfortuitous tort is in one state ... and the intended injury to a recognized victim is in another state, the tortfeasor has affirmatively established minimum contacts with the state in which the injury occurred, if the tortfeasor knew at the time it committed the alleged tort that the victim would be injured in that state"); *Nelson v. R. Greenspan & Co.,* 613 F.Supp. 342, 346 (E.D.Mo.1985).