IN THE

TENTH COURT OF
APPEALS




 
 
 
 
 
 
 


 



No. 10-03-00287-CV

 

Kenneth Lattin, Charles Rice, 

DOUGLAS BENSON, AND RAVIN 

VENTURE CAPITAL FUND, L.L.C.,

 

                                                                      Appellants

 v.

 

Ellwood T. Barrett and 

Ellwood T. Barrett, II,

                                                                      Appellees

 

 

 



From the 12th District Court

Madison County, Texas

Trial Court # 02-9896-012-10

 



O p i n i o n



 

          Ellwood T. Barrett and his son Ellwood T.
Barrett, II, filed suit against Appellants alleging statutory fraud and common
law fraud in connection with the Barretts’ purchase
of shares in a California corporation. 
Appellants filed special appearances, which the court denied.  Appellants contend that they established as a
matter of law that they do not have minimum contacts with Texas and that the court’s decision is contrary to
the great weight and preponderance of the evidence.  Because the court’s decision with respect to
Appellants Douglas Benson and Kenneth Lattin is not
contrary to the great weight and preponderance of the evidence, we will affirm
as to them.  Because there is no evidence
to support the court’s decision with respect to the other appellants, we will
reverse and render as to them.

BACKGROUND

When
the parties engaged in the transaction which is the subject of this litigation,
the Barretts[1]
were Texas residents.[2]  The Barretts have
had a longstanding relationship with Benson, who used to live in Texas.  During
the pertinent time period, Benson was a resident of California.[3]  Benson is a managing director of Ravin Venture Capital Fund, L.L.C., a California corporation, and serves on the board of
directors of CNM Networking, Inc., also a California corporation. 
Benson first told the Mr. Barrett about CNM in 1999 in the course of a
friendly conversation.  Mr. Barrett
testified at the special appearance hearing that Benson called him from California in 2000 and told him, “[Y]ou
have to come out here and see my operation.” 
According to Mr. Barrett, Benson told him that he would “get a
sweetheart deal.”  Benson denies inviting
Mr. Barrett to come to California.

The
parties agree that Mr. Barrett spent the night at Benson’s home in California on July 10 and that they discussed investing in
CNM the following morning.  According to
Benson, Mr. Barrett did not seem interested at that time.  Nevertheless, Mr. Barrett met Ellwood at CNM’s headquarters later that day.  According to Ellwood, they met with Charles
Rice, Kenneth Lattin, and Benson at CNM’s headquarters.[4]  Rice is CNM’s
president and CEO.  Lattin
is a CNM vice president and also a managing director for Ravin.[5]

At
this meeting, Lattin gave the Barretts
a tour of CNM’s facilities and explained CNM’s operations to them. 
He explained that their investments would be made through a limited
liability corporation.  Rice was present
for part of the meeting with the Barretts, but they
presented no evidence that he made any representations to them on that occasion
or that they had any further contact with him. 


The
Barretts contend that Lattin
and/or Benson told them that: (1) this would be CNM’s
last round of funding; (2) CNM had adequate assets and cash on hand to cover
day-to-day operations; (3) CNM did not need further investors; (4) they were
offering this investment to the Barretts to help them
maintain majority ownership of CNM; (5) this was a “super investment” and a
“sweetheart deal”; and (6) CNM would begin trading its shares publicly in the
last quarter of 2000.

The
Barretts complain that Lattin
and Benson failed to tell them that: (1) they would not actually be receiving
shares in CNM but rather would receive shares in Ravin;
(2) their shares would be restricted; (3) their shares were not registered with
the SEC or the Texas State Securities Board; (4) CNM had net operating losses
in 1999 of $13.2 million; (5) CNM had a shareholder deficit of $7.9 million in
December 1999; and (6) CNM had only $109,794 cash on hand at the end of 1999.

The
Barretts returned to Texas and Ellwood made numerous telephone calls to Lattin regarding the investment opportunity.  Ellwood usually left a message, and Lattin returned the call. 
Ellwood says that Lattin reiterated in these
phone conversations the same representations Lattin
and/or Benson had made in their California meeting.

The
Barretts ultimately decided to pursue this
opportunity.  According to the Barretts, Benson personally instructed each of them in
separate telephone conversations to wire the necessary funds to Benson’s bank
account in California.  Mr.
Barrett directed his bank to wire $500,000 to Benson’s account on July 25.  Ellwood directed his bank to wire $152,000 to
Benson’s account on July 27.  Benson
denies giving them wiring instructions but does not deny that the funds were
wired to his account.  Benson later had
those funds transferred to CNM’s account.

Benson
and Lattin filed the necessary incorporating
documents for Ravin with the appropriate California agency on July 28.  Ravin did not
commence operations until September, after its incorporation had been approved
by the pertinent state agency.

The
Barretts later received certificates indicating their
ownership of shares in Ravin, not CNM.  CNM did not begin trading its shares publicly
in the last quarter of 2000, and has not yet done so.  After Ellwood obtained a financial statement
for CNM for 1998 and 1999 and learned that the Barretts’
shares were restricted, this litigation ensued.

Benson,
Lattin, Rice, and Ravin all
filed special appearances, which the court denied after a hearing.  CNM did not pursue a special appearance and
is not a party to this interlocutory appeal.

Appellants
contend that: (1) the undisputed evidence that they are nonresidents satisfied
their burden at the special appearance hearing because the Barretts
failed to make factually-specific jurisdictional allegations in their petition;
(2) they established as a matter of law that they do not have minimum contacts
with Texas; (3) the court’s implied finding of minimum contacts is contrary to
the great weight and preponderance of the evidence; and (4) the court’s
exercise of personal jurisdiction over them does not comport with fair play and
substantial justice.[6]

A NONRESIDENT DEFENDANT MUST HAVE SUFFICIENT

MINIMUM CONTACTS WITH TEXAS FOR A
TEXAS COURT

TO EXERCISE PERSONAL JURISDICTION OVER THAT
DEFENDANT

 

Texas courts may exercise personal jurisdiction over
a nonresident defendant only if the long-arm statute permits it and only if the
exercise of jurisdiction is consistent with due process.  Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002).  To
satisfy due process, a nonresident defendant must have established “minimum
contacts” with Texas and the exercise of jurisdiction over the
defendant must not offend “traditional notions of fair play and substantial
justice.”  Id. (quoting Intl.
Shoe Co. v. Wash., 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945)).

A
nonresident defendant’s contacts can give rise to general or specific
jurisdiction.  Although the Barretts trial pleadings mention both general and specific
jurisdiction, the evidence suggests that, if Texas has personal jurisdiction over any of the
appellants, it is by specific jurisdiction. 
Specific jurisdiction exists when (1) a nonresident defendant has
purposeful contacts with the forum state and (2) the plaintiff’s cause of
action arises from or relates to those contacts.  Id.  The requirement of “purposeful” contacts “ensures
that a defendant will not be haled into a jurisdiction solely as a result of
‘random,’ ‘fortuitous,’ or ‘attenuated’ contacts.”  Burger
King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85
L. Ed. 2d 528 (1985); accord Am. Type
Culture Collection, 83 S.W.3d at 806.

A
nonresident defendant bears the burden of negating all bases for personal
jurisdiction alleged.  Am. Type Culture Collection, 83 S.W.3d at
807.  Although the existence of personal
jurisdiction over a nonresident defendant is a question of law, courts must
frequently resolve disputed fact issues to resolve this legal issue.  BMC Software Belgium, N.V. v. Marchand,
83 S.W.3d 789, 794 (Tex. 2002).  Therefore,
traditional “no evidence” and factual insufficiency standards apply on appeal
to such disputed fact issues.  Id.

Because the court made no findings of fact, we
must presume that the court made all findings necessary to support its judgment.  Id. at 795 (citing Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).  The judgment must be affirmed if it can be
upheld on any legal theory supported by the evidence.  Worford,
801 S.W.2d at 109; Treadway v. Shanks,
110 S.W.3d 1, 5 (Tex. App.—Dallas 2000), aff’d,
110 S.W.3d 444 (Tex. 2003). 

A NONRESIDENT DEFENDANT MUST NEGATE ALL BASES 

OF PERSONAL JURISDICTION ASSERTED BY THE
PLAINTIFF 

IN THE PLEADINGS OR THE EVIDENCE

 

Citing
this Court’s decision in Lacefield v.
Electronic Financial Group, Appellants contend in their first issue that
the undisputed evidence that they are nonresidents satisfied their burden at
the special appearance hearing because the Barretts
failed to make factually-specific jurisdictional allegations in their
petition.  35 S.W.3d
755, 761 (Tex. App.—Waco 2000, no pet.).

However,
we recently disavowed this aspect of Lacefield,
concluding instead that the Supreme Court has expressly rejected such a narrow
approach for special appearance hearings. 
Zimmerman v.
Glacier Guides, Inc., No. 10-03-00036-CV, 2004 Tex. App LEXIS 10112, at *3-5 (Tex. App.—Waco 2004, no pet. h.) (citing Kawasaki Steel Corp. v. Middleton, 699
S.W.2d 199, 203 (Tex. 1985) (per curiam)); see also Tex. R. Civ. P. 120a(3) (trial court “shall determine” special appearance on
pleadings, stipulations, affidavits, discovery responses, and oral testimony); contra Bruno’s Inc. v. Arty Imports, Inc.,
119 S.W.3d 893, 897 (Tex. App.—Dallas 2003, no pet.); Valsangiacomo v. Am. Juice Import, Inc., 35 S.W.3d 201, 205 (Tex.
App.—Corpus Christi 2000, no pet.).  Instead,
“a nonresident defendant bears the burden of negating all bases of personal
jurisdiction alleged in the plaintiff’s pleadings or raised without objection
by the evidence.”  Zimmerman, 2004 Tex. App LEXIS 10112, at *8. 

Accordingly,
we overrule Appellants’ first issue.

BENSON AND LATTIN HAVE SUFFICIENT

MINIMUM CONTACTS, BUT RICE AND RAVIN DO NOT

 

Appellants
contend in their second and third issues that that they established as a matter
of law that they do not have minimum contacts with Texas and that the court’s implied finding of minimum
contacts is contrary to the great weight and preponderance of the
evidence.  We will address these issues
separately for each appellant.

Douglas Benson

Viewing
only the evidence and inferences which favor the court’s ruling with respect to
Benson, Benson solicited Mr. Barrett by telephone at Mr. Barrett’s home in Texas to come to California and consider investing in CNM.  Benson represented to Mr. Barrett that this
investment opportunity was a “sweetheart deal.” 
After their California meeting, Benson again called both of the Barretts and gave them instructions for wiring funds to
Benson’s bank account for the investment. 
Based on this evidence, we cannot say that Benson established as a
matter of law that he does not have sufficient minimum contacts for the court
to exercise personal jurisdiction over him.

The
evidence which tends to contradict the court’s implied finding of minimum
contacts consists essentially of Benson’s denial that he invited Mr. Barrett to
come to California, that he solicited Mr. Barrett by telephone to
consider investing in CNM, or that he called each of the Barretts
with instructions for wiring the funds. 
Benson’s denials presented the trial court with a credibility issue
which it had to resolve.  This Court may
not disturb that determination, even if the evidence would support a different
result.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 407 (Tex. 1998); City of Ft. Worth v. Johnson, 105
S.W.3d 154, 160 (Tex. App.—Waco 2003, no pet.); Vernor v. Sw. Fed. Land
Bank Assn., 77 S.W.3d 364, 367
(Tex. App.—San Antonio 2002, pet. denied).

Although
Benson’s nonresident status supports an inference that he did not have
sufficient minimum contacts, it does not in any way controvert the evidence
recited above which supports the court’s implied finding of sufficient minimum
contacts.  Accordingly, we cannot say
that the court’s implied finding that Benson has sufficient minimum contacts is
contrary to the great weight and preponderance of the evidence.  Thus, we overrule the second and third issues
as to Benson.

Kenneth Lattin

Viewing
only the evidence and inferences which favor the court’s ruling with respect to
Lattin, Lattin made
numerous telephone calls to Ellwood after their California meeting making the verbal representations (and
omissions) which form the basis of this lawsuit.  Lattin knew at that
time that the Barretts were trying to decide whether
to invest.  Thus, the record contains
evidence that Lattin made the alleged
misrepresentations with the intent to persuade the Barretts
to invest.  Based on this evidence, we
cannot say that Lattin established as a matter of law
that he does not have sufficient minimum contacts for the court to exercise
personal jurisdiction over him.

The
evidence which tends to contradict the court’s implied finding of minimum
contacts includes Lattin’s denial that he made these
representations over the telephone.  In
addition, there is no evidence in the record that Lattin
solicited the Barretts to come to California and consider investing in his company.  The Barretts do not
contend otherwise.[7]

Interstate Telephone Calls
Standing Alone

Do Not
Establish Purposeful Contacts

 

Lattin cites several cases which stand for the proposition that
interstate telephone calls generally do not, standing alone, constitute
purposeful contacts with the forum state sufficient to confer personal
jurisdiction.  See Tuscano v. Osterberg, 82 S.W.3d 457,
469 (Tex. App.—El Paso 2002, no pet.); Eakin v. Acosta,
21 S.W.3d 405, 410 (Tex. App.—San Antonio 2000, no pet.); J & J Marine, Inc. v. Ha Van Le, 982 S.W.2d 918, 927 (Tex. App.—Corpus Christi 1998, no pet.); Laykin v. McFall, 830 S.W.2d 266, 269-70
(Tex. App.—Amarillo 1992, orig. proceeding). 
Although we agree with the general proposition stated, each of the cases
cited is distinguishable from the Barretts’ case.

In
Tuscano,
during a telephone call initiated by the plaintiff Osterberg from Texas, Tuscano told
Osterberg for the first time that he did not own any interest in a certain
company.  Osterberg sued Tuscano for fraud on the basis that Tuscano
had previously represented (in New York) that Osterberg had an ownership interest in
the company.  82 S.W.3d
at 469.  The El Paso Court concluded that the telephone conversation was
not a contact on which personal jurisdiction could be based because Osterberg
had initiated it, not Tuscano.  Id.  Although
we do not agree that the issue of which party initiated an interstate
communication is dispositive, we note that the plaintiffs’ claims in Tuscano were
based on prior communications rather than the telephone conversation which was
the focus of the court’s minimum contacts analysis.  Here however, the Barretts’
suit is based in part on representations Lattin
allegedly made to Ellwood over the telephone. 
Thus, Tuscano
does not apply.

In
Eakin, a Texas resident (Eakin)
filed a malpractice suit against Acosta, a Florida attorney. 
Eakin alleged that Acosta had several
different contacts with Texas which conferred general and/or specific jurisdiction.  Eakin claimed that
Acosta’s telephone calls to him gave rise to specific jurisdiction because
Acosta misrepresented his experience and “the degree of fidelity and loyalty he
would extend to Eakin.”  The Court rejected Eakin’s
contention on two grounds: (1) the general rule stated above; and (2) Eakin had sued Acosta for legal malpractice, not
fraud.  See Eakin, 21 S.W.3d at
407-10.  Unlike Eakin however, the Barretts have
sued Lattin for fraud based in large part on the specific
representations he allegedly made to Ellwood over the telephone.

In
J & J Marine, the Texas plaintiffs alleged that J & J’s interstate telephone
conversations with them gave rise to general jurisdiction.  982 S.W.2d at 925-27.  However, the Barretts’
case involves specific jurisdiction, not general jurisdiction.

In
Laykin, a Texas resident (Livermore) solicited Laykin by
telephone to sell a ring for her in California.  Laykin
agreed and Livermore mailed the ring to him.  After sending the ring, Livermore found a buyer in Texas and asked Laykin to return it.  Laykin refused and tried to buy the ring
himself.[8]  Livermore refused and demanded that Laykin return the
ring.  During Laykin’s
attempted negotiation to buy the ring, he sent two letters (one to Livermore and one to her attorney) and made two phone
calls to Livermore.  Livermore sued for conversion, fraud, and DTPA
violations.  See Laykin, 830 S.W.2d at 267-69.

The
Amarillo
 Court
concluded that the telephone calls and letters did not suffice to establish
purposeful contacts by Laykin with respect to the allegations of Livermore’s suit.  Id. at 269-70.  As in Tuscano, Laykin’s
calls and letters were not the basis for Livermore’s suit. 
Thus, Laykin does not apply.

Interstate Telephone Calls Can
Constitute

Purposeful Contacts When The Content Of The

Interstate Conversation Is The Basis

For The Plaintiff’s Suit

 

Several
courts have observed that, when an interstate communication is the specific
conduct on which a suit is based, then the
communication is considered a purposeful contact on which personal jurisdiction
may be based.

In
Michiana Easy Livin’
Country, Inc. v. Holten, a Texas resident (Holten)
alleged that an employee of an Indiana company from which he purchased a motor home
made misrepresentations about the motor home during their negotiations and
discussions over the telephone.  127 S.W.3d 89, 96-97 (Tex. App.—Houston [1st Dist.] 2003, pet.
filed).  The First Court in Houston affirmed the trial court’s denial of Michiana’s special appearance in part because the
misrepresentations were “both the contact with Texas and the basis for Holten’s
claims.”  Id. at 98.

In
Ahadi v. Ahadi, the
defendant called her brother in Dallas from her home in Michigan to convince her brother to move to South Padre Island and manage a condominium for her husband and
her.  He agreed based in part on
representations she made to him during the conversation about
compensation.  When he did not receive
the promised compensation, he sued them in Texas.  See Ahadi, 61
S.W.3d 714, 717 (Tex. App.—Corpus Christi 2001, pet. denied).  The Corpus Christi Court held that the sister’s telephone call was a
sufficient purposeful contact to give rise to specific jurisdiction “because
she allegedly entered into a contract with a foreseeable economic injury in Texas.”  Id. at 720.

In
Ring Power Systems v. International de Comercio y Consultoria, a
Guatemalan corporation with an office in Houston negotiated over the telephone for the purchase
of power generation modules from a Florida company. 
During the course of the telephone conversations and in information
conveyed by facsimile, the Florida company represented that the modules
would generate electricity at a certain capacity, but the modules did not
perform as represented.  See Ring Power Sys., 39 S.W.3d 350, 351-52 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  The Fourteenth Court in Houston found minimum contacts in this case because the
misrepresentations were relied upon in Texas.  Id. at 353-54.

In
Televentures, Inc. v. International Game Technology,
a Texas corporation sued a Nevada corporation after their planned joint venture
did not come to fruition.  12 S.W.3d 900,
904-05 (Tex. App.—Austin 2000, pet. denied). 
The plaintiff corporation, Televentures, cited
numerous interstate telephone, mail, and facsimile communications between the
corporations to establish minimum contacts. 
The Austin
 Court
concluded, however, that the communications cited were “not sufficiently
related to the cause of action.”  Id. at 910.  The court recognized a line
of cases finding sufficient minimum contacts when an interstate “communication
itself was the specific conduct that constituted the tortuous act.”  Id. at 911.  The court concluded,
however, that the communications relied upon by Televentures
were not of this type.  Id. at 912.

In
Memorial Hospital System v. Fisher
Insurance Agency, Inc., the Fourteenth Court found sufficient minimum contacts in a case in
which a Texas hospital called an insurance company in another
state to confirm that a person seeking admission had coverage.  The insurance company incorrectly stated that
the patient was covered.  See Meml. Hosp. Sys., 835 S.W.2d 645, 648
(Tex. App.—Houston [14th Dist.] 1992, no writ).  As in Ahadi, the court observed that this single telephone
communication was a sufficient contact because the defendant knew that the
plaintiff would rely upon its statement and thus “it allegedly committed a tort
with a foreseeable economic injury in Texas.”  Id. at 651.

In
Read v. Cary, an Arkansas defendant advised the Texas plaintiffs by telephone that he intended to
sell his shares in a certain company to an undisclosed principal who had also
approached the plaintiffs about purchasing their shares.  Relying on this representation, the
plaintiffs sold their shares, only to discover that the defendant was in fact
the undisclosed principal.  See Read, 615 S.W.2d 296,
297-98 (Tex. Civ. App.—Dallas 1981, writ ref’d n.r.e.).  The Dallas Court found sufficient minimum contacts because the
defendant’s representation was “designed to result in some economic benefit to
him,” he initiated it, and he profited from it. 
Id. at 299.

As
with the plaintiffs in Michiana,
Ahadi, Ring Power Systems, Memorial Hospital, and Read,
the Barretts’ suit is based in part on the
representations Lattin allegedly made over the
telephone to Ellwood.

 

The Question Of
Which Party Initiated

An Interstate Communication Is Not

Necessarily Dispositive

 

Another
factor which tends to contradict the court’s implied finding is the fact that
Ellwood initiated virtually all of the telephone communications with Lattin.  However, the
question of who initiated an interstate telephone call is not necessarily
determinative on the issue of minimum contacts. 
See Michiana
Easy Livin’ Country, 127 S.W.3d at 96-99; Ring Power Sys., 39 S.W.3d at 351-52; Meml. Hosp. Sys., 835 S.W.2d at 651; but cf. Tuscano,
82 S.W.3d at 469 (defendant’s statement to plaintiff in single telephone call
initiated by plaintiff insufficient to establish minimum contacts); City of Riverview, Mich. v. Am. Factors,
Inc., 77 S.W.3d 855, 856-59 (Tex. App.—Dallas 2002, no pet.) (Michigan city’s single telephone call to Texas company in response to
letter insufficient to establish minimum contacts).

As
previously noted, the court in Memorial
Hospital found sufficient minimum contacts where the plaintiff initiated an
interstate telephone call to an insurance company in another state to determine
whether a person seeking admission to the hospital had coverage.  The court concluded that the issue of which
party initiated the conversation was not determinative in that case because the
insurance company knew or should have known that the hospital would rely on its
representations.  See Meml. Hosp. Sys., 835
S.W.2d at 651.  The Fourteenth Court has affirmed the validity of its analysis in a
more recent decision and the First Court has expressed its agreement with this analysis
as well.  See Michiana Easy Livin’
Country, 127 S.W.3d at 96-99; Ring
Power Sys.,
39 S.W.3d at 354.

 

 

 

The District Court For
The Southern District Of Texas 

Does Not Agree With The
Decision In Memorial Hospital
System

 

In
a case with facts virtually identical to those in Memorial Hospital (and apparently involving the same hospital), a
federal judge in the Southern District of Texas concluded that a single
telephone call from a Texas hospital to a nonresident insurance company to
inquire about coverage does not establish sufficient minimum contacts.  Meml. Hosp. Sys. v. Blue Cross & Blue Shield of Ark., 830 F. Supp. 968, 971-74 (S.D. Tex. 1993).[9]  We note that the decision of a federal
district court is not binding precedent, even when it concerns a matter of
federal law.[10]  See Penrod Drilling Corp. v. Williams, 868 S.W.2d 294, 296
(Tex. 1993); Heggy v. Am. Trading
Employee Ret. Account Plan, 56 S.W.3d 280, 284 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

More
importantly though, the federal district court cited five federal appellate
decisions[11]
which we deem distinguishable, and the court’s own decision seems at odds with
what it stated was the “critical” component for a minimum contacts analysis.

The
court cited decisions of the Second, Seventh, Eighth, and Eleventh Circuits in
support of its decision.  Blue Cross & Blue Shield, 830 F.
Supp. at 973 (citing Sun Bank, N.A. v.
E.F. Hutton & Co., 926 F.2d 1030, 1034 (11th Cir. 1991); Fox v. Boucher, 794 F.2d 34, 37 (2d Cir.
1986); Mountaire Feeds, Inc. v. Agro Impex,
S.A., 677 F.2d 651, 652 (8th Cir. 1982); McBreen v. Beech Aircraft Corp., 543 F.2d 26, 31 (7th Cir. 1976)).

In
Sun Bank, the nonresident defendant
had no personal stake in the representations he made during the course of the
interstate telephone call.  Rather, he
was merely responding to a request for information.  926 F.2d at 1032; cf. Read, 615 S.W.2d at 299 (defendant’s statement
“apparently designed to result in some economic benefit to him”).

In
Fox, the nonresident defendant
initiated an interstate telephone call in an effort to enforce her legal rights
under the laws of her home state.  794
F.2d at 36; see also In re Est. of Judd,
8 S.W.3d 436, 442-45 (Tex. App.—El Paso 1999, no pet.) (mailing
of demand letter from New York to Texas did not establish minimum contacts for
declaratory judgment action in Texas to determine parties’ rights); Ham v. La Cienega
Music Co., 4 F.3d 413, 416 (5th Cir. 1993) (same).

In Mountaire Feeds,
the statements made during the course of the interstate communications were not
the basis for the suit.  677 F.2d at 652;
cf. Michiana
Easy Livin’ Country, 127 S.W.3d at 98; Ahadi, 61 S.W.3d
at 720; Ring Power Sys., 39 S.W.3d at
354; Meml. Hosp. Sys., 835
S.W.2d at at 650-51; Read, 615 S.W.2d at 299.

In McBreen, the defendant did not know the origin of the
interstate telephone call he answered.  543 F.2d at 28.  Thus,
he could not have been said to have made “purposeful” contacts with Illinois (from whence the call originated).  See Burger King Corp.,
471 U.S.
at 475, 105 S. Ct.
at 2183; Am. Type Culture Collection,
83 S.W.3d at 806.

          As
noted, the decision in Blue Cross &
Blue Shield also seems at odds with what the district court stated was the
“critical” component for a minimum contacts analysis.  The court stated, “[T]he type of
foreseeability that is critical to establishing in personam
jurisdiction over an out-of-state defendant is that the defendant’s own
purposeful acts have some effect in the forum.”  830 F. Supp. at 972 (citing Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 112, 107 S. Ct. 1026, 1032-33, 94 L. Ed. 2d
92 (1987)).  Certainly, the defendant insurance company’s
misrepresentation about the existence of insurance coverage had an effect on
the plaintiff hospital company’s decision to admit the patient.  However, the federal district court concluded
otherwise.

          For
these reasons, we decline to follow the holding in Blue Cross & Blue Shield.[12]

The Dallas and El
 Paso Courts of Appeals

Have Also Issued Decisions in
Apparent Conflict

With Memorial Hospital
System

 

The
Dallas
 Court
has expressly rejected the reasoning of Memorial
Hospital Systems and the El Paso Court has implicitly done so.  See City of
Riverview, 77
S.W.3d at 858; Tuscano,
82 S.W.3d at 469.  However, both of these
decisions are distinguishable.

In
City of Riverview, a Texas corporation (American Factors) notified a Michigan city by letter that all future payments for
janitorial services performed by the corporation with which the city had
contracted (ABC Janitorial Services) should be forwarded to the offices of
American Factors.  The letter provided
two telephone numbers which could be called if there were any questions.  A city employee called to inquire about ABC’s
status.  An American Factors employee
advised the city employee that ABC had assigned its accounts receivable to
American Factors to raise some working capital. 
During the conversation, the city employee “promised” that the city
would send all future payments to American Factors, but the city did not.  Instead, the city continued to send its
payments to ABC.  American Factors sued
both.  City of Riverview, 77 S.W.3d at 856-57.

In
City of Riverview, as in the Eleventh Circuit’s decision in Sun Bank, the city did not stand to gain
any economic benefit from the representation it made.  Cf.
Read, 615 S.W.2d at 299.  In addition, the case involved only a single
telephone call whereas the evidence in this case suggests that Lattin had several telephone conversations with Ellwood
before the latter decided to invest.  Cf. Ring Power Sys., 39 S.W.3d at 351.

As
has already been explained, the facts of Tuscano are distinguishable from the
facts in the Barretts’ case because the plaintiffs’
claims in Tuscano
were based not on representations made in the interstate telephone conversation
at issue but rather on previous statements the defendant had personally made to
one of the plaintiffs in New York.  82
S.W.3d at 469.  Here however, the Barretts’ suit is based in part on representations Lattin allegedly made to Ellwood over the telephone.  Thus, Tuscano does not apply.

Because
the court made no findings of fact, we must presume that the court made all
findings necessary to support its judgment, and the judgment must be affirmed
if it can be upheld on any legal theory supported by the evidence.  See BMC
Software Belgium, 83 S.W.3d at 794; Worford, 801 S.W.2d at 109; Treadway, 110 S.W.3d at 5.  

From
the evidence presented, the trial court could have found that Lattin engaged in several interstate telephone
conversations during which he made misrepresentations in an effort to persuade
Ellwood to invest in CNM.  The Barretts’ suit is based on these alleged
misrepresentations.  Accordingly, we
cannot say that the court’s implied finding that Lattin
has sufficient minimum contacts is contrary to the great weight and
preponderance of the evidence.  Thus, we
overrule the second and third issues as to Lattin.

 

 

Charles Rice

          The Barretts
failed to assert in their pleadings or in the evidence presented that Rice had
any purposeful contacts with Texas.  It is
undisputed that Rice is not a Texas resident. 
Accordingly, Rice established as a matter of law that he does not have
minimum contacts with Texas.  Thus, we sustain the
second issue as to Rice, and we need not address the third issue as to him.

Ravin Venture Capital Fund

The
Barretts failed to assert in their pleadings or in
the evidence presented that Ravin had any purposeful
contacts with Texas.  In
fact, Ravin did not come into existence until after
the events which give rise to the Barretts’
suit.  It is undisputed that Ravin is a California corporation. 
Accordingly, Ravin established as a matter of
law that it does not have minimum contacts with Texas.  Thus,
we sustain the second issue as to Ravin, and we need
not address the third issue as to it.

FAIR PLAY AND SUBSTANTIAL JUSTICE

Benson and Lattin contend in
their fourth issue that subjecting them to the jurisdiction of a Texas court
“offend[s] ‘traditional notions of fair play and substantial justice.’”  Am. Type Culture
Collection, 83 S.W.3d at 806 (quoting Intl. Shoe, 326 U.S. at 316, 66 S. Ct. at 158). 
To determine this issue, we must examine other factors including: (1)
“the burden on the defendant”;  (2) “the forum State’s interest in
adjudicating the dispute”;  (3) “the
plaintiff's interest in obtaining convenient and effective relief”; (4) “the
interstate judicial system’s interest in obtaining the most efficient
resolution of controversies”; and (5) “the shared interest of the several
States in furthering fundamental substantive social policies.”  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S. Ct. 559, 564, 62 L. Ed. 2d 490
(1980); Guardian Royal Exch. Assurance,
Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 231 (Tex. 1991); Lacefield, 35 S.W.3d at 760.

As
we explained in Lacefield:

“Because the minimum contacts analysis now
encompasses so many considerations of fairness, it has become less likely that
the exercise of jurisdiction will fail a fair play analysis.”  Schlobohm v. Schapiro,
784 S.W.2d 355, 357-58 (Tex. 1990); Fish v. Tandy Corp., 948 S.W.2d 886, 895 (Tex.App.—Fort
Worth 1997, pet. denied).  Thus, “[o]nly in
rare cases” will the exercise of jurisdiction over a nonresident defendant who
has purposefully established sufficient minimum contacts with the forum state
not comport with fair play and substantial justice.  Guardian
Royal Exch. Assurance, 815 S.W.2d at 231; Fish, 948 S.W.2d at 895; see
also Burger King, 471 U.S. at 476-78, 105 S. Ct. at 2184-85.

 

35
S.W.3d at 761.

Benson
argues that subjecting him to litigation in Texas violates fair play and
substantial justice because: (1) litigating this case in Texas would pose a
significant burden upon him because of a heart condition, (2) any interest
Texas may have had in vindicating the Barretts’
rights is now attenuated because Ellwood has moved to California, (3) the
burden on Mr. Barrett to prosecute this suit in California is “insignificant,”
and (4) California has a greater interest in regulating its own corporations
than does Texas.  As will be explained,
we agree with only the latter contention.

Lattin argues that subjecting him to litigation in Texas violates fair play and substantial justice
because: (1) the Barretts voluntarily initiated contact
with him in California to investigate the merits of investing in CNM,
(2) the investment was consummated in California, (3) the Barretts did
not wire their funds to him, and (4) Ellwood now lives in California.  As will
be explained, the first and third contentions have no bearing on this inquiry,
and the second and fourth do not dictate that maintaining the Barretts’ suit in Texas offends fair play and substantial justice.

With
regard to Benson’s heart condition, it must be noted that, even though Benson
currently resides in Tennessee, the implication of his argument is that litigating the dispute in
California would be less burdensome for him than
litigating it in Texas.  The
trial court was justified in rejecting this contention.

Ellwood
testified that his job requires him to spend a substantial amount of time in Texas, where he still has an apartment.  Mr. Barrett still resides in Texas.  Thus, Texas’s connection to this litigation is not as
attenuated as Benson and Lattin suggest.

Benson
characterizes the burden on Mr. Barrett to litigate in California as “insignificant” in light of his prior travel
to that state.  However, the trial court
could have reasonably concluded otherwise.

Benson
contends that California has a greater interest in this litigation than
does Texas because it involves a California resident and two California corporations. 
We agree that this factor would weigh against maintaining the suit in Texas.

Lattin contends that litigating this suit in California may be more efficient because many of the
pertinent facts occurred there.  Although
it cannot be denied that events in California are a critical part of the Barretts’
case, the trial court could have reasonably concluded that these events were
not of such a nature as to require that the suit be maintained in California.

Accordingly,
we cannot say that the court erred by concluding that requiring Benson and Lattin to defend this suit in Texas does not “offend ‘traditional notions of fair play and
substantial justice.’”  Am. Type Culture Collection, 83 S.W.3d at
806 (quoting Intl. Shoe, 326 U.S. at 316, 66 S. Ct. at 158). 
Thus, we overrule Benson’s and Lattin’s fourth
issue.

 

CONCLUSION

 

We affirm the court’s order insofar as it denies
Benson’s and Lattin’s special appearances.  We reverse the order insofar as it denies
Rice’s and Ravin’s special appearances and render
judgment sustaining the special appearances of Rice and Ravin.

 

FELIPE REYNA

Justice

 

 

 

Before Chief Justice Gray,

Justice Vance, and

Justice Reyna

(Chief Justice Gray concurs only in the result
without a separate opinion)

Affirmed in part,

Reversed and rendered in part

Opinion delivered and filed November
 17, 2004

[CV06]











[1]           To
avoid confusion, we refer to Ellwood T. Barrett hereinafter as “Mr. Barrett”
and to his son Ellwood T. Barrett, II, as “Ellwood.”

 





[2]           Ellwood
now lives in California.

 





[3]           Benson
now lives in Tennessee.

 





[4]           Benson
denies being present at this meeting.

 





[5]           Lattin and Benson are Ravin’s
only managing directors.





[6]           Lattin and Rice jointly filed an appellants’
brief.  Benson and Ravin
are represented by other counsel and likewise jointly filed an appellants’
brief.  Neither brief specifically
enumerates the issues presented.  We have
done so for purposes of this opinion.





[7]           The
Barretts suggest in their pleadings and evidence that
the minimum contacts of one defendant (e.g.,
Benson) may be attributed to another defendant (e.g., Lattin or Rice) when those
defendants are acting in concert. 
However, case law is clear that “it is the contacts of the defendant
himself that are determinative.”  Natl. Indus. Sand Assn. v. Gibson, 897
S.W.2d 769, 773 (Tex. 1995) (orig. proceeding) (quoting Siskind v. Villa Found. For Educ., Inc., 642
S.W.2d 434, 437-38 (Tex. 1982); citing Rush v. Savchuk, 444 U.S. 320, 331-32, 100 S. Ct. 571, 579, 62 L. Ed. 2d 516
(1980)).  An exception to this settled
principle arises when it is alleged that a business organization with
sufficient minimum contacts is merely the alter ego of an individual or other
organization who does not have sufficient minimum contacts standing alone.  See
e.g. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 798-99 (Tex. 2002); Carone v. Retamco Operating, Inc., 138 S.W.3d 1, 12-13 (Tex.
App.—San Antonio 2004, pet. denied).  The
Barretts’ allegations do not fit within this
exception.





[8]           Livermore’s mother had bought the ring from Laykin in his
Arizona jewelry store 24 years earlier and had become
“personal friends” with Laykin and his wife. 
See Laykin v.
McFall, 830 S.W.2d 266, 272 (Tex. App.—Amarillo 1992, orig. proceeding) (Poff, J., dissenting).  Laykin’s wife
expressed a desire to own the ring when Livermore’s mother bought it.  Laykin contended that Livermore’s mother agreed to sell it to them upon her
death for the original (1965) purchase price. 
When Livermore mailed the ring to Laykin, he gave it to his
wife who “was reluctant to give it up.”  Id.





[9]           To
avoid confusion between this federal decision and the decision in Memorial Hospital System v. Fisher Insurance
Agency, we cite the former hereinafter as Blue Cross & Blue Shield.

 





[10]          The
application of the Texas long-arm statute is essentially a federal
question because the statute “reaches ‘as far as the federal constitutional
requirements of due process will allow.’” 
Am. Type Culture Collection, Inc.
v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002) (quoting Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,
815 S.W.2d 223, 226 (Tex. 1991)).

 





[11]          The
court also cited a significant number of federal district court decisions which
we do not address.  Meml. Hosp. Sys. v. Blue Cross & Blue Shield
of Ark., 830 F. Supp. 968, 973-74 (S.D. Tex. 1993).





[12]          Blue Cross & Blue Shield may also be
distinguishable because it involved a single telephone call whereas the
evidence in this case suggests that Lattin had
several telephone conversations with Ellwood before the latter decided to
invest.  See also Ring Power Sys. v. Intl. de Comercio y Consultoria, 39
S.W.3d 350, 351 (Tex. App.—Houston [14th Dist.] 2001, no pet.).