COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| ZINC NACIONAL, S.A., | § | |
| Appellant, | § | No. 08-07-00314-CV |
| | § | Appeal from |
| v. | § | 34th District Court |
| BOUCHE TRUCKING, INC., | § | of El Paso County, Texas |
| Appellee, | § | (TC # 2001-4505) |
| v. | § | |
| JORGE ARRELLANO, | § | |
| Party In Interest/Plaintiff. | § | |
| | § | |

## **O P I N I O N**

Zinc Nacional, S.A. brings this interlocutory appeal from the denial of a special appearance. At issue is whether a Mexican company that trucks its product into the United States at Laredo, Texas for transport to New Mexico may be sued in Texas for negligence in loading the trailer at its facility in Monterrey, Mexico which allegedly caused an accident that injured a Texas driver. For the reasons that follow, we affirm.

### **FACTUAL SUMMARY**

Zinc Nacional is a Mexican corporation with its principal place of business in Monterrey, Mexico. The company manufactures paper and paper-related products for worldwide distribution. It does not maintain an office in Texas, employ anyone in Texas, advertise in Texas, or market its products in Texas. Zinc has some 260 customers worldwide, thirty of which are located in the

United States, and three or four of which are located in Texas. It also receives raw materials from suppliers in Texas. Zinc contracts with C.H. Robinson de Mexico, a Mexican entity, for the transportation of its products throughout Mexico and into the United States.

Zinc focuses on selling its products to drywall manufacturing plants located in New Mexico, Nevada, and Florida. American Gypsum, located in Albuquerque, New Mexico, has been a customer of Zinc's grey-back paper products for the past seven years. Zinc ships American Gypsum approximately 300 metric tons of product per month. On average, it ships two to three loads a week.

On December 13, 1999, Zinc loaded eight rolls of grey-back paper onto a trailer in Monterrey, Mexico, pursuant to a purchase order from American Gypsum.[1] The trailer was provided by C.H. Robinson. C.H. Robinson trucked the load from Monterrey, Mexico, to Laredo, Texas. At that point, the customary procedure was to deliver the load to a customs agent in order to cross the shipment into the United States. In this case, the customs agent was Juan Alvarado Brokerage. The purchase order specified that the shipping terms were "F.O.B. Mid-Bridge Laredo." This ensures, in effect, that the transfer of title took place in Nuevo Laredo, Tamaulipas, Mexico. The shipment was then picked up in Laredo by Bouche Trucking, Inc.--a Texas corporation--which had been subcontracted by C.H. Robinson to transport the products to New Mexico.

Jorge Arellano is a long haul truck driver for Bouche. On December 14, 1999, Arellano was instructed to pick up a load containing numerous rolls of grey-back paper for transport to American Gypsum in Albuquerque. During transport, the rolls shifted causing the trailer rig to overturn in Texas on U.S. 55 North. Arellano sued Bouche, alleging it was negligent in: (1) failing to properly

---

[1] Because of the size and weight of the rolls, Zinc loads them onto a trailer using a specialized forklift loader. The rolls are then secured using specialized supports and inflatable pillows purchased and provided by Zinc to ensure that the rolls do not shift during transport. This particular load weighed between 2.5 and 3 metric tons. Because the paper is delicate and fragile, the rolls are to remain on the same trailer from the time of loading in Monterrey until they are unloaded in New Mexico by the same specialized forklift owned by American Gypsum.

load the rolls of paper onto the trailer, (2) failing to properly secure the rolls of paper onto the trailer, and (3) failing to properly hire and/or train its personnel and/or its agents on the proper manner of loading. Bouche then filed a third party petition against Zinc Nacional seeking indemnity and contribution since Zinc employees actually loaded the paper rolls onto the trailer.[2] Zinc filed a special appearance which the trial court denied. This interlocutory appeal follows.

## STANDARD OF REVIEW

The plaintiff bears the initial burden of pleading sufficient allegations to bring a non-resident defendant within the personal jurisdiction of a Texas court. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333 (Tex. 2009); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex.2002). The non-resident defendant then assumes the burden of negating all bases of jurisdiction in those allegations. *Id*.

Whether a trial court has personal jurisdiction over a defendant is a question of law, which we review *de novo*. *Retamco*, 278 S.W.3d at 337. However, the trial court frequently must resolve questions of fact before deciding the question of jurisdiction. *BMC Software*, 83 S.W.3d 794. If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *Id*. Where, as here, the trial court does not issue findings, all fact findings necessary to support the judgment and supported by the evidence are implied. *Id*. at 795.

## LONG-ARM JURISDICTION

Texas courts may assert *in personam* jurisdiction over a non-resident if (1) the Texas long-

---

[2] During oral argument, we were advised that Zinc created a new product line specifically for American Gypsum and that every roll of paper is unique pursuant to specifications. The round rolls of paper are contained in square boxes and each load is sealed in Monterrey before transport.

arm statute[3] authorizes the jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due process guarantees. *Retamco*, 278 S.W.3d at 337, *citing Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990). The long-arm statute permits Texas courts to exercise jurisdiction over non-resident defendants that do business in Texas, and the statute contains a non-exclusive list of activities that constitute "doing business". TEX.CIV.PRAC.&REM.CODE ANN. § 17.042 (Vernon 2008). A non-resident does business in Texas if it commits a tort in whole or in part in the state. TEX.CIV.PRAC.&REM.CODE ANN. § 17.042(2). A tort is committed where the resulting injury occurs. *Hupp v. Siroflex of America, Inc.*, 848 F.Supp. 744 (S.D.Tex. 1994), *citing Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1189-90 (5th Cir. 1984).

Section 17.042's broad language extends personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software*, 83 S.W.3d at 795, *quoting U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977). Consequently, we consider whether it is consistent with federal constitutional requirements of due process for Texas courts to assert *in personam* jurisdiction. *See Guardian Royal Exchange Assurance, Ltd. v. English China Clays*, 815 S.W.2d 223, 226 (Tex. 1991). We rely on both federal and Texas decisions in determining whether a non-resident defendant has met its burden to negate all bases of jurisdiction. *BMC Software*, 83 S.W.3d at 795.

## MINIMUM CONTACTS

The United States Supreme Court divides the due process requirement into two parts: (1) whether the non-resident defendant has purposefully established minimum contacts with the forum state, and if so, (2) whether the exercise of jurisdiction comports with traditional notions of fair play

---

[3] TEX.CIV.PRAC.&REM.CODE ANN. §§ 17.041-.045 (Vernon 2008).

and substantial justice. *BMC Software*, 83 S.W.3d at 795, *citing International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed 95 (1945). We focus on the defendant's activities and expectations when deciding whether it is proper to bring the defendant before a Texas court. *Retamco*, 278 S.W.3d at 338. A defendant establishes minimum contacts when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* Personal jurisdiction exists if the non-resident's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Id.; BMC Software*, 83 S.W.3d at 795-96, *citing Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). For a court to exercise specific jurisdiction over a non-resident defendant, two requirements must be met: (1) the defendant's contacts with the forum must be purposeful, and (2) the cause of action must arise from or relate to those contacts. *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). One exception to the "arising from" requirement is the stream of commerce doctrine. *Asahi Metal Indusry Co., Ltd. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). The minimum contacts analysis for specific jurisdiction focuses on the relationship between the defendant, the forum, and the litigation. *Helicopteros*, 466 U.S. at 414, 104 S.Ct. 1872; *Michiana Easy Livin' Country Inc.*, 168 S.W.3d at 790. In contrast, general jurisdiction exists when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *BMC Software*, 83 S.W.3d at 796. We are asked to address only specific jurisdiction here.

## Purposeful Availment

Courts consider three issues in deciding whether a defendant purposefully availed itself of

the privilege of conducting business in Texas:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Retamco*, 278 S.W.3d at 339, *citing Moki Mac*, 221 S.W.3d at 575. In concluding that defendant Republic Drilling Company's contacts with Texas were purposeful, the court recognized that while Republic may not have actually entered the state to facilitate the transaction, "[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state." *Retamco*, 278 S.W.3d at 339, *citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

We conclude that Zinc's contacts with Texas were purposeful. Zinc deliberately structured its business to use Texas ports of entry and Texas roads and highways to transport its products to New Mexico on a regular basis. There is also an adequate relationship between Zinc, the forum, and the litigation. This case does not involve a third party purchaser in New Mexico who trucked Zinc's product through Texas without its knowledge. Zinc purposefully transferred title to its load in the middle of the bridge at Laredo, but every shipment bound for the United States crossed at the Laredo point of entry and was trucked through the State of Texas utilizing Texas ports and highways.[4] The

---

[4] There is a dispute as to whether Zinc actually transferred title mid-bridge or in the City of Laredo, Texas. During his deposition, Zinc's general manager distinguished between delivery to Laredo, Texas and delivery to Nuevo Laredo, Mexico:

> A:    The customary procedure is it's delivered to a customs agent, customs broker. In this case it was Juan Alvarado Brokerage.
>
> Q:    Are they in Nuevo Laredo or --
>
> A:    No. They're in Laredo -- Laredo, Texas. And we deliver it to them.

trial court took judicial notice that if a product crosses the Mexican border into Laredo, it necessarily must pass through Texas to reach New Mexico:

> [S]omething that enters Laredo, Texas, couldn't proceed anywhere without going through Texas. I mean, there is nowhere else. You have got to go at least several hundred miles through Texas in some direction, even if they're going to go to another final destination. Like, in this case they're going to New Mexico, so there would be a period of time that it would be going through Texas.

And his perception is accurate. Zinc is based in Monterrey, the capitol of the State of Nuevo Leon.

The City of Monterrey advertises at www.teamnafta.com:

### TRANSPORTATION

> The State of Nuevo Leon has an excellent 4,588 miles highway system. To the north, it connects with Laredo, TX, which is the closest border crossing point from Monterrey leading to the vast North American market. Highways are in excellent condition, tough [sic] they experience some heavy traffic, in particular Federal Highway 57.

> The recently opened International Bridge of Colombia provides quick access to the U.S. About 286,015 loaded trucks cross northbound to the U.S. every year with a similar number crossing southbound to Mexico. (Source: State of Nuevo Leon Government).

NAFTA, the North American Free Trade Agreement, allows the commercial transactions but does not control the method of transfer. Zinc controls the loading of the shipment and the method of transfer. Zinc picked a Texas port of entry, the closest port of entry. Laredo, one of 24 Texas ports of entry, is only 150 miles from Monterrey. New Mexico has three ports of entry--Santa Teresa, Columbus, and Antelope Wells. Zinc could have chosen to truck its product across Mexican highways for entry at Santa Teresa [located at the Texas/New Mexico/Mexico border], which is 560 miles from Monterrey. In short, it opted for the closest and quickest route across the best roadways. In so doing, it availed itself of Texas benefits.

**Arising From or Related To**

We turn now to the second prong of specific jurisdiction. Zinc first directs our attention to *World-Wide Volksvagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). There, the United States Supreme Court considered whether "an Oklahoma court may exercise *in personam* jurisdiction over a nonresident automobile retailer and its wholesale distributor in a products-liability action, when the defendants' only connection with Oklahoma is the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma." The plaintiffs, residents of New York, purchased an automobile from a New York dealership. *Id*. at 287-88. The car was involved in an accident in Oklahoma two years later. *Id*. at 288. The plaintiffs brought a products liability suit against several defendants in Oklahoma, including World-Wide Volksvagen Corp., a regional distributor of the car in New York. *Id*. The court declined jurisdiction because the isolated incident, although foreseeable, was not sufficient to confer personal jurisdiction. *Id*. at 295-297. It is the defendant's conduct and its connection with the forum state that determine whether the defendant should reasonably anticipate being haled into court. *Id*. Citing *World-Wide*, Zinc argues that while a trucking accident might be foreseeable, it has purposefully structured its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. In other words, it delivers its truck loads at mid-bridge Laredo to avoid being haled into Texas courts. As we have noted, however, the general manager testified that the trailer is delivered to the customs broker at Laredo, Texas.

Arellano responds that Zinc delivered its paper products into the stream of commerce. This was the issue in *Asahi*: Did the defendant's awareness that the components it manufactured, sold, and delivered outside the United States would reach the forum state in the stream of commerce constitute minimum contacts such that the exercise of jurisdiction would not offend "traditional notions of fair play and substantial justice"? *Asahi,* 480 U.S. at 105. There, the plaintiff filed a

products liability action in California. *Id*. at 106. Asahi, the manufacturer, was joined in an indemnification claim. *Id*. The Supreme Court discussed the stream of commerce theory, but issued a plurality opinion with two differing views. *Id*. at 111-117. Justice O'Connor concluded that a non-resident defendant must specifically intend to serve the market in the forum state by, among other things, "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id*. at 111-12 (O'Connor, J.). Texas has adopted Justice O'Connor's view of the stream of commerce doctrine. *See Michiana Easy Livin' Country Inc. v. Holten*, 168 S.W.3d 777, 786 (Tex. 2005).

In *Michiana*, the plaintiff initiated a telephone call with an Indiana company that sold recreational vehicles, hoping to get a better price that what was offered locally. He purchased an RV that was constructed and equipped outside Texas. It was paid for outside Texas. And it was shipped to Texas at the plaintiff's request and entirely at his expense. In rejecting the application of the stream of commerce doctrine, the majority noted that Michiana did not place large numbers of RVs in a stream of commerce flowing to Texas, adding that stream-of-commerce jurisdiction requires a stream, not a dribble. Michiana did not design, advertise, or distribute RVs in Texas. The court concluded that the Fourteenth Amendment does not permit Texas to exercise personal jurisdiction over a foreign manufacturer merely because it knew its product would be shipped here. *Michiana*, 168 S.W.3d at 784.

Zinc relies upon *Micheana* in support of its argument that it must have intended that the specific product be targeted at Texas, and it had no such intent since no grey-back paper is sold in Texas. But we are persuaded by the words of the unanimous opinion in *Retamco*: "an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the

company purposefully directed its activities toward Texas." *Retamco*, 278 S.W.3d at 340.

Zinc also argues that even if it is foreseeable that a truck might be involved in an accident in Texas, foreseeability is not enough. *See World-Wide Volksvagen Corp.*, 444 U.S. at 295. It also contends that just like in *Asahi*, it has not specifically intended to serve the market in Texas just by shipping its product through Texas. Finally, Zinc maintains that it has not met the stream of commerce theory requiring additional conduct such as "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi,* 480 U.S. at 112.

We find an important distinction between both *World-Wide Volksvagen Corp.* and *Asahi* and the facts of this case. Both *World-Wide* and *Asahi* were product liability cases. Here, there is a negligence claim relating to the improper loading of certain rolls of paper onto a trailer. There is no claim that Zinc improperly or defectively manufactured the grey-back paper, put the paper into the stream of commerce, and then the paper caused injury to the plaintiff. Instead, the allegation is that Zinc negligently loaded the product onto a trailer, and that same load--while on its way to a customer in New Mexico--caused an accident in Texas. Zinc did not merely foresee the possibility of its product passing through Texas, it purposefully loaded its product knowing with certainty that the trailer it loaded would pass through Texas. Our conclusion is strengthened by the recent Texas Supreme Court decision in *Retamco*, where the court mandated consideration of the claims involved in the litigation to determine the operative facts. *Retamco*, 278 S.W.3d at 340. There, as here, "[t]hese contacts are sufficient to demonstrate that this alleged tort occurred at least, in part, in Texas." *Id.* at 341. We conclude that the cause of action--the alleged negligent loading of the product--arose from an accident involving a truck that Zinc loaded, knowing it would enter the

United States and travel across the state of Texas.

## FAIR PLAY AND SUBSTANTIAL JUSTICE

Having concluded that Zinc purposefully established minimum contacts with Texas, we must also determine whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). In deciding this issue, we consider the following factors when appropriate: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiffs interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal*, 815 S.W.2d at 231. The fourth and fifth factors need not be considered in cases involving a foreign defendant. *Guardian Royal*, 815 S.W.2d at 232. We are mindful, however, that only in rare cases will exercise of jurisdiction not comport with fair play and substantial justice when the non-resident defendant has purposefully established minimum contacts with the forum state. *Id*. It is incumbent upon the defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. at 233, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528, 543-44 (1985).

In *EMI Music Mexico, S.A. de C.V. v. Rodriguez*, the defendant claimed that its status as an international defendant was a determinative factor in the fairness analysis. 97 S.W.3d 847, 860 (Tex.App.--Corpus Christi 2003, no pet.). The court disagreed, despite the defendant's argument that the injuries occurred in Mexico and that many of witnesses were in Mexico. *Id*. The court stated that distance alone is not ordinarily sufficient to defeat jurisdiction as "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a state

where he engages in economic activity." *Id., quoting McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The court also found that Texas had a substantial interest in adjudicating the matter because all but one of the injured members of the music band were residents of Texas, and one of the companies was a Texas Company. *Id.* at 860. The evidence showed that the defendant traveled to Texas six to eight times a year to meet musicians in Texas to coordinate promotional events in Mexico. The court concluded that Texas had a strong "interest in providing effective means of redress of its residents." *Id., quoting McGee*, 355 U.S. at 223, 78 S.Ct. 199.

The burden on Zinc does not offend traditional notions of fair play and substantial justice. Just as in *EMI*, the distance between Monterrey, Mexico and El Paso, Texas is not sufficient to defeat jurisdiction. Zinc admittedly sends a representative through Texas to New Mexico on a regular basis. El Paso is served by the El Paso International Airport, and our sister city, Ciudad Juarez, hosts an international airport as well. Moreover, Texas has a keen interest in maintaining the safety of its roads and citizens. We should not be heard to say that every truck loaded in Mexico and transported through Texas by a Mexican company faces the risk of *in personam* jurisdiction. Such an analysis is inherently fact specific. Here, however, Arellano is a Texas resident who works for a Texas company. The accident occurred in Texas on a Texas highway. Zinc regularly and purposefully ships its products through Texas to New Mexico. Despite the specifications on the purchase order that the shipping terms were "F.O.B. Mid-Bridge Laredo," thus contemplating transfer of title in Nuevo Laredo, Mexico, Zinc's general manager pointedly testified that the load at issue was delivered to the customs broker in Laredo, Texas and not in Nuevo Laredo, Mexico. We thus conclude that the exercise of jurisdiction over Zinc by a Texas court does not offend traditional notions of fair play and substantial justice. We overrule Zinc's sole point and affirm the

judgment of the trial court.

July 31, 2009

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating